## AMERICAN INSURANCE ASSOCIATION ET AL. *v.* GARAMENDI, INSURANCE COMMISSIONER, STATE OF CALIFORNIA

No. 02–722.   Argued April 23, 2003—Decided June 23, 2003

398

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and BREYER, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SCALIA, and THOMAS, JJ., joined, *post*, p. 430.

*Kenneth S. Geller* argued the cause for petitioners. With him on the briefs were *John J. Sullivan, Stephen M. Shapiro, Neil M. Soltman, Peter Simshauser, William H. Webster, Linda Dakin-Grimm,* and *Sally Agel. Frederick W. Reif* filed briefs for respondents Gerling Companies urging reversal. With him on the briefs were *Dina G. Daskalakis, Keith D. Barrack, George L. O'Connell,* and *Timothy P. Grieve.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. With him on the briefs were *Acting Solicitor General Clement, Assistant Attorney General McCallum, Barbara McDowell, Mark B. Stern, Douglas Hallward-Driemeier,* and *William H. Taft IV.*

*Frank Kaplan* argued the cause for respondent. With him on the brief were *Jesse J. Contreras, Larry G. Simon, Andrew W. Stroud, Michael D. Ramsey,* and *Leslie Tick.**

JUSTICE SOUTER delivered the opinion of the Court.

California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA or Act), Cal. Ins. Code Ann. §§ 13800–13807 (West Cum. Supp. 2003), requires any insurer doing business in that State to disclose information about all policies sold in Europe between 1920 and 1945 by the company itself or any one "related" to it. The issue here is whether HVIRA interferes with the National Government's conduct of foreign relations. We hold that it does, with the consequence that the state statute is preempted.

## I

### A

The Nazi Government of Germany engaged not only in genocide and enslavement but theft of Jewish assets, includ-

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States et al. by *Kim Heebner Price* and *Robin S. Conrad;* for the Federal Republic of Germany by *Roger M. Witten;* for the Government of Switzerland by *Stephan E. Becker;* and for Mitsubishi Materials Corp. et al. by *Walter Dellinger, John H. Beisner, David M. Balabanian, Margaret K. Pfeiffer, Arne D. Wagner,* and *Paul J. Hall.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Manuel Medeiros,* State Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, *J. Matthew Rodriquez,* Senior Assistant Attorney General, and *Daniel L. Siegel,* Supervising Deputy Attorney General, and by the Attorneys General for their respective jurisdictions as follows: *William H. Pryor, Jr.,* of Alabama, *G. Steven Rowe* of Maine, *J. Joseph Curran, Jr.,* of Maryland, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Brian Sandoval* of Nevada, *Peter C. Harvey* of New Jersey, *Eliot Spitzer* of New York, *Jim Petro* of Ohio, *Anabelle Rodríguez* of Puerto Rico, *Greg Abbott* of Texas, and *Christine O. Gregoire* of Washington; for Bet Tzedek Legal Services et al. by *Gregory R. Smith, Elizabeth K. Penfil, David A. Lash,* and *Martin Mendelsohn;* for the National Association of Insurance Commissioners by *Ross S. Myers;* and for Representative Henry A. Waxman et al. by *Kenneth Chesebro.*

ing the value of insurance policies, and in particular policies of life insurance, a form of savings held by many Jews in Europe before the Second World War. Early on in the Nazi era, loss of livelihood forced Jews to cash in life insurance policies prematurely, only to have the government seize the proceeds of the repurchase, and many who tried to emigrate from Germany were forced to liquidate insurance policies to pay the steep "flight taxes" and other levies imposed by the Third Reich to keep Jewish assets from leaving the country. See G. Feldman, Allianz and the German Insurance Business, 1933–1945, pp. 249–262 (2001). Before long, the Reich began simply seizing the remaining policies outright.[1] In 1941, the 11th Decree of the Reich Citizenship Law declared the confiscation of assets (including insurance policies) of Jews deported to the concentration camps, and two years later the 13th Decree did the same with respect to property of the dead, each decree requiring banks and insurance companies to identify Jewish accounts and transmit the funds to the Reich treasury. *Id.*, at 264–274. After the war, even a policy that had escaped confiscation was likely to be dishonored, whether because insurers denied its existence or claimed it had lapsed from unpaid premiums during the persecution, or because the government would not provide heirs with documentation of the policyholder's death. See M. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 117–122 (2003). Responsibility as between the government and insurance companies is disputed, but at the end

---

[1] A vivid precursor of the kind of direct confiscation that would become widespread by 1941 was the Reich's seizure of property and casualty insurance proceeds in the aftermath of the November 1938 Kristallnacht, in which Nazi looting and vandalism inflicted damage to Jewish businesses, homes, and synagogues worth nearly 50 million deutsch marks. Days afterward, a Reich decree mandated that all proceeds of all insurance claims arising from the damage be paid directly to the state treasury, an obligation ultimately settled by German insurance companies with the Reich at a mere pittance relative to full value. See Feldman, Allianz and the German Insurance Business, at 190–235.

of the day, the fact is that the value or proceeds of many insurance policies issued to Jews before and during the war were paid to the Reich or never paid at all.

These confiscations and frustrations of claims fell within the subject of reparations, which became a principal object of Allied diplomacy soon after the war. At the Potsdam Conference, the United States, Britain, and the Soviet Union took reparations for wartime losses by seizing industrial assets from their respective occupation zones, putting into effect the plan originally envisioned at the Yalta Conference months before. Protocol of Proceedings of the Berlin (Potsdam) Conference, 1945, in 3 Dept. of State, Treaties and Other International Agreements of the United States of America 1776–1949, pp. 1207, 1213–1214 (C. Bevans comp. 1969) (hereinafter Bevans); Report of the Crimea (Yalta) Conference, 1945, in 3 Bevans 1005; Protocol of the Crimea (Yalta) Conference on the Question of the German Reparation in Kind, 1945, in 3 Bevans 1020. A year later, the United States was among the parties to an agreement to share seized assets with other western allies as settlement, as to each signatory nation, of "all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature, arising out of the war." Agreement on Reparation from Germany, on the Establishment of Inter-Allied Reparation Agency and Restitution of Monetary Gold, 61 Stat. 3163, Art. 2(A), T. I. A. S. No. 1655 (hereinafter Paris Agreement).

The effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. They worried that continued reparations would cripple the new Federal Republic of Germany economically, and so decided in the London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany

during that war, and by nationals of such countries, against the Reich and agencies of the Reich . . . until the final settlement of the problem of reparation." Agreement on German External Debts, Feb. 27, 1953, 4 U. S. T. 443, 449, T. I. A. S. No. 2792. These terms were construed by German courts as postponing resolution of foreign claims against both the German Government and German industry, to await the terms of an ultimate postwar treaty. See Neuborne, Preliminary Reflections on Aspects of Holocaust-Era Litigation in American Courts, 80 Wash. U. L. Q. 795, 813–814, and n. 62 (2002).

In the meantime, the western Allies placed the obligation to provide restitution to victims of Nazi persecution on the new West German Government. See Convention on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952, 6 U. S. T. 4411, 4452–4484, as amended by Protocol on Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, [1955] 6 U. S. T. 4117, T. I. A. S. No. 3425. This had previously been a responsibility of the western military governments, which had issued several decrees for the return of property confiscated by the Nazis. See N. Robinson, Restitution Legislation in Germany: A Survey of Enactments (1949); U. S. Military Law Nos. 52 and 59 (reprinted in U. S. Military Government Gazette, Germany, Issue A, p. 24 (June 1, 1946) and Issue G, p. 1 (Nov. 10, 1947)). West Germany enacted its own restitution laws in 1953 and 1956, see Institute of Jewish Affairs, The (West German) Federal Compensation Law (BEG) and its Implementary Regulations (1957), and signed agreements with 16 countries for the compensation of their nationals, including the Luxembourg Agreement with Israel, Sept. 10, 1952, 162 U. N. T. S. 205; see Supplemental Excerpts of Record in No. 01–17023 (CA9) (SER), p. 1244. Despite a payout of more than 100 billion deutsch marks as of 2000, see *ibid.*, these measures left out many claimants and certain types of claims, and when the agreement reunifying East and West

Germany, see Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, 1696 U. N. T. S. 124, was read by the German courts as lifting the London Debt Agreement's moratorium on Holocaust claims by foreign nationals, class-action lawsuits for restitution poured into United States courts against companies doing business in Germany during the Nazi era. See Neuborne, *supra*, at 796, n. 2, 813–814; see generally Bazyler, Nuremberg in America: Litigating the Holocaust in United States Courts, 34 Rich. L. Rev. 1 (2000) (describing the flood of lawsuits after 1996).

These suits generated much protest by the defendant companies and their governments, to the point that the Government of the United States took action to try to resolve "the last great compensation related negotiation arising out of World War II." SER 940 (press briefing by Deputy Secretary of Treasury Eizenstat); see S. Eizenstat, Imperfect Justice 208–212 (2003). From the beginning, the Government's position, represented principally by Under Secretary of State (later Deputy Treasury Secretary) Stuart Eizenstat, stressed mediated settlement "as an alternative to endless litigation" promising little relief to aging Holocaust survivors. SER 953 (press conference by Secretary of State Albright). Ensuing negotiations at the national level produced the German Foundation Agreement, signed by President Clinton and German Chancellor Schröder in July 2000, in which Germany agreed to enact legislation establishing a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies, to be used to compensate all those "who suffered at the hands of German companies during the National Socialist era." Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).

The willingness of the Germans to create a voluntary compensation fund was conditioned on some expectation of security from lawsuits in United States courts, and after

extended dickering President Clinton put his weight behind two specific measures toward that end. SER 937 (letter from President Clinton to Chancellor Schröder committing to a "mechanism to provide the legal peace desired by the German government and German companies"); see also Eizenstat, *supra,* at 253–258. First, the Government agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government of the United States would submit a statement that "it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II." 39 Int'l Legal Materials, at 1303. Though unwilling to guarantee that its foreign policy interests would "in themselves provide an independent legal basis for dismissal," that being an issue for the courts, the Government agreed to tell courts "that U. S. policy interests favor dismissal on any valid legal ground." *Id.,* at 1304. On top of that undertaking, the Government promised to use its "best efforts, in a manner it considers appropriate," to get state and local governments to respect the foundation as the exclusive mechanism. *Id.,* at 1300.[2]

As for insurance claims specifically, both countries agreed that the German Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization formed in 1998 by several European insurance companies, the State of Israel, Jewish and Holocaust survivor associations, and the National

---

[2] The executive agreement was accompanied by a joint statement signed by the American and German Governments, the Governments of Israel and five Eastern European countries, and the Conference on Jewish Material Claims Against Germany, Inc., "[r]ecognizing that it would be in the participants' interests for the Foundation to be the exclusive remedy and forum" for all Holocaust-era claims against German companies. Excerpt of Record in No. 01–17023 (CA9) (ER), pp. 812–816.

Association of Insurance Commissioners, the organization of American state insurance commissioners. The job of the ICHEIC, chaired by former Secretary of State Eagleburger, includes negotiation with European insurers to provide information about unpaid insurance policies issued to Holocaust victims and settlement of claims brought under them. It has thus set up procedures for handling demands against participating insurers, including "a reasonable review . . . of the participating companies' files" for production of unpaid policies, "an investigatory process to determine the current status" of insurance policies for which claims are filed, and a "claims and valuation process to settle and pay individual claims," employing "relaxed standards of proof." SER 1236–1237.

In the pact with the United States, Germany stipulated that "insurance claims that come within the scope of the current claims handling procedures adopted by the [ICHEIC] and are made against German insurance companies shall be processed by the companies and the German Insurance Association on the basis of such procedures and on the basis of additional claims handling procedures that may be agreed among the Foundation, ICHEIC, and the German Insurance Association." 39 Int'l Legal Materials, at 1299. And in a supplemental agreement formalized in October 2002, the German Foundation agreed to set aside 200 million deutsch marks, to be used for insurance claims approved by the ICHEIC and a portion of the ICHEIC's operating expenses, with another 100 million in reserve if the initial fund should run out. Agreement Concerning Holocaust Era Insurance Claims, in Lodging of Petitioners in *Gerling Global Reinsurance Corp.* v. *Garamendi,* No. 02–733, pp. L–70 to L–71, L–78 to L–79, cert. pending. [REPORTER'S NOTE: See *post,* p. 955.] The foundation also bound itself to contribute 350 million deutsch marks to a "humanitarian fund" administered by the ICHEIC, *id.,* at L–80, and it agreed to work with the German Insurance Association and the German insurers who

had joined the ICHEIC, "with a view to publishing as comprehensive a list as possible of holders of insurance policies issued by German companies who may have been Holocaust victims," *id.*, at L–147. Those efforts, which control release of information in ways that respect German privacy laws limiting publication of business records, have resulted in the recent release of the names of over 360,000 Holocaust victims owning life insurance policies issued by German insurers. See Treaster, Holocaust List Is Unsealed by Insurers, N. Y. Times, Apr. 29, 2003, section A, p. 26, col. 6.

The German Foundation pact has served as a model for similar agreements with Austria and France,[3] and the United States Government continues to pursue comparable agreements with other countries. Reply Brief for Petitioners 6, n. 2.

## B

While these international efforts were underway, California's Department of Insurance began its own enquiry into the issue of unpaid claims under Nazi-era insurance policies, prompting state legislation designed to force payment by defaulting insurers. In 1998, the state legislature made it an

---

[3] Agreement Between the Government of the United States of America and the Government of France Concerning Payments for Certain Losses Suffered During World War II, Jan. 18, 2001, 2001 WL 416465; Agreement between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," 40 Int'l Legal Materials 523 (2001); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL 935261, Annex A, § 2(n). Though the French agreement does not address insurance, the agreement with Austria does. Austria agreed to devote a $25 million fund for payment of claims processed according to the ICHEIC's procedures. See *ibid.* Austria also agreed to "make the lists of Holocaust era policy holders publicly accessible, to the extent available." *Ibid.* The United States Government agreed, in turn, that the settlement fund should be viewed as "the exclusive . . . forum" for the resolution of Holocaust-era claims asserted against the Austrian Government or Austrian companies. 40 Int'l Legal Materials, at 524.

unfair business practice for any insurer operating in the State to "fai[l] to pay any valid claim from Holocaust survi-° vors." Cal. Ins. Code Ann. § 790.15(a) (West Cum. Supp. 2003). . The legislature placed "an affirmative duty" on the Department of Insurance "to play an independent role in representing the interests of Holocaust survivors," including an obligation to "gather, review, and analyze the archives of insurers . . . to provide for research and investigation" into unpaid insurance claims. §§ 12967(a)(1), (2).

State legislative efforts culminated the next year with passage of Assembly Bill No. 600, 1999 Cal. Stats. ch. 827, the first section of which amended the State's Code of Civil Procedure to allow. state residents to sue in state court on insurance claims based on acts perpetrated in the Holocaust and extended the governing statute of limitations to December 31, 2010. Cal. Civ. Proc. Code Ann. § 354.5 (West Cum. Supp. 2003). The section of the bill codified as HVIRA, at issue here,[4] requires "[a]ny insurer currently doing business in the state" to disclose the details of "life, property, liability, health, annuities, dowry, educational, or casualty insurance policies" issued "to persons in Europe, which were in effect between 1920 and 1945." Cal. Ins. Code Ann. § 13804(a) (West Cum. Supp. 2003). The duty is to make disclosure not only about policies the particular insurer sold, but also about those sold by any "related company," *ibid.*, including "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer," § 13802(b),[5] whether or not the companies were related dur-

---

[4] Challenges to Cal. Civ. Proc. Code Ann. § 354.5 (West Cum. Supp. 2003) and Cal. Ins. Code Ann. § 790.15 (West Cum. Supp. 2003) were dismissed by the District Court for lack of standing, a ruling that was not appealed. See *Gerling Global Reinsurance Corp. of America* v. *Low*, 240 F. 3d 739, 742–743 (CA9 2001).

[5] These terms are further defined in the commissioner's regulations. Cal. Code Regs., Tit. 10, § 2278.1 (1996). An "affiliate" company is one that "directly, or indirectly, through one or more intermediaries, controls,

ing the time when the policies subject to disclosure were sold, § 13804(a). Nor is the obligation restricted to policies sold to "Holocaust victims" as defined in the Act, § 13802(a); it covers policies sold to anyone during that time, § 13804(a). The insurer must report the current status of each policy, the city of origin, domicile, or address of each policyholder, and the names of the beneficiaries, § 13804(a), all of which is to be put in a central registry open to the public, § 13803. The mandatory penalty for default is suspension of the company's license to do business in the State, § 13806, and there are misdemeanor criminal sanctions for falsehood in certain required representations about whether and to whom the proceeds of each policy have been distributed, § 13804(b).

HVIRA was meant to enhance enforcement of both the unfair business practice provision (§ 790.15) and the provision for suit on the policies in question (§ 354.5) by "ensur[ing] that any involvement [that licensed California insurers] or their related companies may have had with insurance policies of Holocaust victims are *[sic]* disclosed to the state." § 13801(e); see *ibid.* (HVIRA is designed to "ensure the rapid resolution" of unpaid insurance claims, "eliminating the further victimization of these policyholders and their families"); Excerpt of Record in No. 01–17023 (CA9) (ER), p. 994 (California Senate Committee on Insurance report) (HVIRA was proposed to "ensure that Holocaust victims or their heirs can take direct action on their own behalf with regard to insurance policies and claims"). While the legislature acknowledged that "[t]he international Jewish community is in active

---

or is controlled by, or is under common control with, the [insurer]." Cal. Ins. Code Ann. § 1215(a) (West 1993) (cross-referenced in § 2278.1(e)). A "[m]anaging [g]eneral [a]gent" is a company that "negotiates and binds ceding reinsurance contracts on behalf of an insurer or manages all or part of the insurance business of an insurer." § 769.819(c) (cross-referenced in § 2278.1(c)). A "reinsurer" is "a parent, subsidiary or affiliate of the insurer that provides reinsurance." Cal. Code Regs., Tit. 10, § 2278.1(i) (1996).

negotiations with responsible insurance companies through the [ICHEIC] to resolve all outstanding insurance claims issues," it still thought the Act "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f).

After HVIRA was enacted, administrative subpoenas were issued against several subsidiaries of European insurance companies participating in the ICHEIC. See, e. g., SER 785, 791. Immediately, in November 1999, Deputy Secretary Eizenstat wrote to the insurance commissioner of California that although HVIRA "reflects a genuine commitment to justice for Holocaust victims and their families, it has the unfortunate effect of damaging the one effective means now at hand to process quickly and completely unpaid insurance claims from the Holocaust period, the [ICHEIC]." *Id.*, at 975. The Deputy Secretary said that "actions by California, pursuant to this law, have already threatened to damage the cooperative spirit which the [ICHEIC] requires to resolve the important issue for Holocaust survivors," and he also noted that ICHEIC Chairman Eagleburger had expressed his opposition to "sanctions and other pressures brought by California on companies with whom he is obtaining real cooperation." *Id.*, at 976. The same day, Deputy Secretary Eizenstat also wrote to California's Governor making the same points, and stressing that HVIRA would possibly derail the German Foundation Agreement: "Clearly, for this deal to work . . . German industry and the German government need to be assured that they will get 'legal peace,' not just from class-action lawsuits, but from the kind of legislation represented by the California Victim Insurance Relief Act." *Id.*, at 970. These expressions of the National Government's concern proved to be of no consequence, for the state commissioner announced at an investigatory hearing in December 1999 that he would enforce HVIRA to its

fullest, requiring the affected insurers to make the disclosures, leave the State voluntarily, or lose their licenses. ER 1097.

## II

After this ultimatum, the petitioners here, several American and European insurance companies and the American Insurance Association (a national trade association), filed suit for injunctive relief against respondent insurance commissioner of California, challenging the constitutionality of HVIRA. The District Court issued a preliminary injunction against enforcing the Act, reflecting its probability judgment that "HVIRA is unconstitutional based on a violation of the federal foreign affairs power and a violation of the Commerce Clause." App. to Pet. for Cert. 110a. On appeal, the Ninth Circuit rejected these grounds for questioning the Act but left the preliminary injunction in place until the District Court could consider whether petitioners were likely to succeed on their due process claim. *Gerling Global Reinsurance Corp. of America* v. *Low,* 240 F. 3d 739, 754 (2001).

On remand, the District Court addressed two points. Although it held the Act to be within the State's "legislative jurisdiction," as it applied only to insurers licensed to do business in the State, the District Court granted summary judgment to the petitioners on the ground of a procedural due process violation in "mandating license suspension for non-performance of what may be impossible tasks without allowing for a meaningful hearing." *Gerling Global Reinsurance Corp. of America* v. *Low,* 186 F. Supp. 2d 1099, 1108, 1113 (ED Cal. 2001). In a second appeal, the same panel of the Ninth Circuit reversed again. While it agreed that the Act was not beyond the State's legislative authority, the Court of Appeals rejected the conclusion that procedural due process required an opportunity for insurers to raise an impossibility excuse for noncompliance with the law, 296 F. 3d 832, 845–848 (2002), and it reaffirmed its prior ruling that

the Act violated neither the foreign affairs nor the foreign commerce powers, *id.*, at 849. Given the importance of the issue,[6] we granted certiorari, 537 U. S. 1100 (2003), and now reverse.[7]

## III

The principal argument for preemption made by petitioners and the United States as *amicus curiae* is that HVIRA interferes with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France. The major premises of the argument, at least, are beyond dispute. There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the "concern for uniformity in this country's dealings with foreign nations" that animated the Constitution's allocation of the foreign relations power to the National Government in the first place. *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 427, n. 25 (1964); see *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363,

---

[6] Several other States have passed laws similar to HVIRA. See Holocaust Victims Insurance Act, Fla. Stat. § 626.9543 (Cum. Supp. 2003); Holocaust Victims Insurance Act, Md. Ins. Code Ann. §§ 28–101 to 28–110 (2002); Holocaust Victims Insurance Relief Act of 2000, Minn. Stat. § 60A.053 (Cum. Supp. 2003); Holocaust Victims Insurance Act of 1998, N. Y. Ins. Law §§ 2701–2711 (Consol. 2000); Holocaust Victims Insurance Relief Act of 1999, Wash. Rev. Code §§ 48.104.010–48.104.903 (2003); see also Ariz. Rev. Stat. Ann. § 20–490 (West Cum. Supp. 2003); Tex. Ins. Code Ann., Art. 21.74 (Vernon 2003). And similar bills have been proposed in other States. See, *e. g.*, Mass. Senate Bill No. 843 (Jan. 1, 2003).

[7] Two petitions for certiorari were filed, one by the petitioners in this case (No. 02–722), and one, raising additional issues, by the Gerling Companies (No. 02–733), which were also appellees below. Our grant of certiorari in No. 02–722 encompassed three of the questions addressed by the Ninth Circuit: whether HVIRA intrudes on the federal foreign affairs power, violates the self-executing element of the Foreign Commerce Clause, or exceeds the State's "legislative jurisdiction." Pet. for Cert. I. Because we hold that HVIRA is preempted under the foreign affairs doctrine, we have no reason to address the other questions.

381–382, n. 16 (2000) (" '[T]he peace of the WHOLE ought not to be left at the disposal of a PART' " (quoting The Federalist No. 80, pp. 535–536 (J. Cooke ed. 1961) (A. Hamilton))); *Id.*, No. 44, at 299 (J. Madison) (emphasizing "the advantage of uniformity in all points which relate to foreign powers"); *Id.*, No. 42, at 279 (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations"); see also *First Nat. City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759, 769 (1972) (plurality opinion) (act of state doctrine was "fashioned because of fear that adjudication would interfere with the conduct of foreign relations"); *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 449 (1979) (negative Foreign Commerce Clause protects the National Government's ability to speak with "one voice" in regulating commerce with foreign countries (internal quotation marks omitted)).

Nor is there any question generally that there is executive authority to decide what that policy should be. Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610–611 (1952) (Frankfurter, J., concurring). While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, in foreign affairs the President has a degree of independent authority to act. See, *e. g., Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs"); *Youngstown, supra*, at 635–636, n. 2 (Jackson, J., concurring in judgment and opinion of Court) (the President can "act in external affairs without congressional authority" (citing *United States* v. *Curtiss-*

*Wright Export Corp.,* 299 U. S. 304 (1936))); *First Nat. City Bank* v. *Banco Nacional de Cuba, supra,* at 767 (the President has "the lead role . . . in foreign policy" (citing *Sabbatino, supra*)); *Sale* v. *Haitian Centers Council, Inc.,* 509 U. S. 155, 188 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs").

At a more specific level, our cases have recognized that the President has authority to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic. See *Dames & Moore* v. *Regan,* 453 U. S. 654, 679, 682–683 (1981); *United States* v. *Pink,* 315 U. S. 203, 223, 230 (1942); *United States* v. *Belmont,* 301 U. S. 324, 330–331 (1937); see also L. Henkin, Foreign Affairs and the United States Constitution 219, 496, n. 163 (2d ed. 1996) ("Presidents from Washington to Clinton have made many thousands of agreements . . . on matters running the gamut of U. S. foreign relations"). Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens who lost their cargo when Dutch privateers overtook the schooner *Wilmington Packet.* See *Dames & Moore, supra,* at 679–680, and n. 8; 5 Dept. of State, Treaties and Other International Acts of the United States 1075, 1078–1079 (H. Miller ed. 1937). Given the fact that the practice goes back over 200 years, and has received congressional acquiescence throughout its history, the conclusion "[t]hat the President's control of foreign relations includes the settlement of claims is indisputable." *Pink, supra,* at 240 (Frankfurter, J., concurring); see 315 U. S., at 223–225 (opinion of the Court); *Belmont, supra,* at 330–331; *Dames & Moore, supra,* at 682.

The executive agreements at issue here do differ in one respect from those just mentioned insofar as they address

claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. · Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone.[8] Acceptance of this historical practice is supported by a good pragmatic reason for depending on executive agreements to settle claims against foreign corporations associated with wartime experience. As shown by the history of insurance confiscation mentioned earlier, untangling government policy from private initiative during wartime is often so hard that diplomatic action settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments. While a sharp line between public and private acts works for many purposes in the domestic law, insisting on the same line in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies. Cf. *Pink, supra,* at 234–242 (Frankfurter, J., concurring) (noting the unsoundness of transplanting "judicial subtleties" of domestic law into "the solution of analogous problems between friendly nations").

Generally, then, valid executive agreements are fit to preempt state law, just as treaties are,[9] and if the agreements

---

[8] The Yalta and Potsdam Agreements envisioning dismantling of Germany's industrial assets, public and private, and the followup Paris Agreement aspiring to settle the claims of western nationals against the German Government and private agencies were made as executive agreements. See *supra,* at 403 (citing agreements); see also L. Margolis, Executive Agreements and Presidential Power in Foreign Policy 15–16 (1986). ·

[9] Subject, that is, to the Constitution's guarantees of individual rights. See *Reid* v. *Covert,* 354 U. S. 1, 15–19 (1957); *Boos* v. *Barry,* 485 U. S. 312, 324 (1988). Even Justice Sutherland's reading of the National Government's "inherent" foreign affairs power in *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304 (1936), contained the caveat that the power,

here had expressly preempted laws like HVIRA, the issue would be straightforward. See *Belmont, supra,* at 327, 331; *Pink, supra,* at 223, 230–231. But petitioners and the United States as *amicus curiae* both have to acknowledge that the agreements include no preemption clause, and so leave their claim of preemption to rest on asserted interference with the foreign policy those agreements embody. Reliance is placed on our decision in *Zschernig v. Miller,* 389 U. S. 429 (1968).

*Zschernig* dealt with an Oregon probate statute prohibiting inheritance by a nonresident alien, absent showings that the foreign heir would take the property "without confiscation" by his home country and that American citizens would enjoy reciprocal rights of inheritance there. *Id.,* at 430–431. Two decades earlier, *Clark v. Allen,* 331 U. S. 503 (1947), had held that a similar California reciprocity law "did not on its face intrude on the federal domain," *Zschernig, supra,* at 432, but by the time Zschernig (an East German resident) brought his challenge, it was clear that the Oregon law in practice had invited "minute inquiries concerning the actual administration of foreign law," 389 U. S., at 435, and so was providing occasions for state judges to disparage certain foreign regimes, employing the language of the anti-Communism prevalent here at the height of the Cold War, see *id.,* at 440 (the Oregon law had made "unavoidable judicial criticism of nations established on a more authoritarian basis than our own"). Although the Solicitor General, speaking for the State Department, denied that the state statute "unduly interfere[d] with the United States' conduct of foreign relations," *id.,* at 434 (internal quotation marks omitted), the Court was not deterred from exercising its own judgment to invalidate the law as an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress," *id.,* at 432.

---

"like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.,* at 320.

The *Zschernig* majority relied on statements in a number of previous cases open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict. The Court cited the pronouncement in *Hines* v. *Davidowitz*, 312 U. S. 52, 63 (1941), that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." See 389 U. S., at 432; *id.*, at 442–443 (Stewart, J., concurring) (setting out the foregoing quotation). Likewise, Justice Stewart's concurring opinion viewed the Oregon statute as intruding "into a domain of exclusively federal competence." *Id.*, at 442; see also *Belmont*, 301 U. S., at 331 ("[C]omplete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states" (citing *Curtiss-Wright Export Corp.*, 299 U. S., at 316 *et seq.*)).

Justice Harlan, joined substantially by Justice White, disagreed with the *Zschernig* majority on this point, arguing that its implication of preemption of the entire field of foreign affairs was at odds with some other cases suggesting that in the absence of positive federal action "the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations." 389 U. S., at 459 (opinion concurring in result) (citing cases); see *id.*, at 462 (White, J., dissenting).[10] Thus, for Justice Harlan it was crucial that the challenge to the Oregon

---

[10] Justice Harlan concurred in the majority's result because he would have found the Oregon statute preempted by a 1923 treaty with Germany. 389 U. S., at 457. This required overruling the Court's construction of that treaty in *Clark* v. *Allen*, 331 U. S. 503 (1947), which Justice White, in dissent, declined to do, 389 U. S., at 462.

statute presented no evidence of a "specific interest of the Federal Government which might be interfered with" by the law. *Id.*, at 459 (opinion concurring in result); see *id.*, at 461 (finding "no evidence of adverse effect in the record"). He would, however, have found preemption in a case of "conflicting federal policy," see *id.*, at 458–459, and on this point the majority and Justices Harlan and White basically agreed: state laws "must give way if they impair the effective exercise of the Nation's foreign policy," *id.*, at 440 (opinion of the Court). See also *Pink*, 315 U. S., at 230–231 ("[S]tate law must yield when it is inconsistent with, or impairs . . . the superior Federal policy evidenced by a treaty or international compact or agreement"); *id.*, at 240 (Frankfurter, J., concurring) (state law may not be allowed to "interfer[e] with the conduct of our foreign relations by the Executive").

It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in the *Zschernig* opinions,[11] but the question requires

---

[11] The two positions can be seen as complementary. If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. See, *e. g.*, *Hines* v. *Davidowitz*, 312 U. S. 52, 63 (1941). Where, however, a State has acted within what Justice Harlan called its "traditional competence," 389 U. S., at 459, but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted. Whether the strength of the federal foreign policy interest should itself be weighed is, of course, a further question. Cf. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) (congressional occupation of the field is not to be presumed "in a field which the States have traditionally occupied"); *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 507–508 (1988) ("In an area of uniquely federal interest," "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption").

no answer here. For even on Justice Harlan's view, the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law. And since on his view it is legislation within "areas of . . . traditional competence" that gives a State any claim to prevail, 389 U. S., at 459, it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. Cf. *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 768–769 (1945) (under negative Commerce Clause, "reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved"); Henkin, Foreign Affairs and the United States Constitution, at 164 (suggesting a test that "balance[s] the state's interest in a regulation against the impact on U. S. foreign relations"); Maier, Preemption of State Law: A Recommended Analysis, 83 Am. J. Int'l L. 832, 834 (1989) (similar). Judged by these standards, we think petitioners and the Government have demonstrated a sufficiently clear conflict to require finding preemption here.

## IV

### A

To begin with, resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, *Pink, supra,* at 225, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries, *Dames & Moore,* 453 U. S., at 679. The issue of

restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two. The foregoing account of negotiations toward the three settlement agreements is enough to illustrate that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions. See also, *e. g.*, Hearings on H. R. 2693 before the Subcommittee of Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 24 (2002) (statement of Ambassador Randolph M. Bell that it is the "policy of the U. S. Government" "to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation, and cooperation"); Hearings on the Status of Insurance Restitution for Holocaust Victims and the Heirs before the House Committee on Government Reform, 107th Cong., 1st Sess., 77 (2001) (statement of Ambassador J. D. Bindenagel to the same effect). As for insurance claims in particular, the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with the ICHEIC to develop acceptable claim procedures, including procedures governing disclosure of policy information.

See German Foundation Agreement, 39 Int'l Legal Materials, at 1299, 1303 (declaring the German Foundation to be the "exclusive forum" for demands against German companies and agreeing to have insurance claims resolved under procedures developed through negotiation with the ICHEIC); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL 935261, Annex A, §2(n) (same for Austria). This position, of which the agreements are exemplars, has also been consistently supported in the high levels of the Executive Branch, as mentioned already, *supra*, at 411. See also, *e. g.*, Hearing before the Committee on House Banking and Financial Services, 106th Cong., 2d Sess., 173 (2000) (Deputy Secretary Eizenstat statement that "[t]he U. S. Government has supported [the ICHEIC] since it began, and we believe it should be considered the exclusive remedy for resolving insurance claims from the World War II era"); Hearings on H. R. 2693, at 24 (statement by Ambassador Bell to the same effect); Hearing on the Legacies of the Holocaust before the Senate Committee on Foreign Relations, 106th Cong., 2d Sess., 23 (2000) (Eizenstat testimony that a company's participation in the ICHEIC should give it " 'safe haven' from sanctions, subpoenas, and hearings relative to the Holocaust period").[12] The approach taken serves to resolve the several competing matters of national concern apparent in the German Foundation Agreement: the national interest in maintaining amica-

---

[12] In *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.*, 512 U. S. 298, 328–330 (1994), we declined to give policy statements by Executive Branch officials conclusive weight as against an opposing congressional policy in determining whether California's "worldwide combined reporting" tax method violated the Foreign Commerce Clause. The reason, we said, is that "[t]he Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.'" *Id.*, at 329 (quoting Art. I, §8, cl. 3). As we have discussed, however, in the field of foreign policy the President has the "lead role." *First Nat. City Bank* v. *Banco Nacional de Cuba*, 406 U. S. 759, 767 (1972).

ble relationships with current European allies; survivors' interests in a "fair and prompt" but nonadversarial resolution of their claims so as to "bring some measure of justice . . . in their lifetimes"; and the companies' interest in securing "legal peace" when they settle claims in this fashion. 39 Int'l Legal Materials, at 1304. As a way for dealing with insurance claims, moreover, the voluntary scheme protects the companies' ability to abide by their own countries' domestic privacy laws limiting disclosure of policy information. See Brief for Federal Republic of Germany as *Amicus Curiae* 12–13.[13]

California has taken a different tack of providing regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail. The situation created by the California legislation calls to mind the impact of the Massachusetts Burma law on the effective exercise of the President's power, as recounted in the statutory preemption case, *Crosby* v. *National Foreign Trade Council,* 530 U. S. 363 (2000). HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, employs "a different, state system of economic pressure," and in doing so undercuts the Presi-

---

[13] The dissent would discount the executive agreements as evidence of the Government's foreign policy governing disclosure, saying they "do not refer to state disclosure laws specifically, or even to information disclosure generally." *Post,* at 441 (opinion of GINSBURG, J.). But this assertion gives short shrift to the agreements' express endorsement of the ICHEIC's voluntary mechanism, which encompasses production of policy information, not just actual payment of unpaid claims. See *supra,* at 406–407. The dissent would also dismiss the other Executive Branch expressions of the Government's policy, see *supra,* at 411, 422, insisting on nothing short of a formal statement by the President himself, see *post,* at 441–443. But there is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is no apparent reason for adopting the dissent's "nondelegation" rule to apply within the Executive Branch.

dent's diplomatic discretion and the choice he has made exercising it. *Id.*, at 376. Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, *id.*, at 377, HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own policies on disclosure. "Quite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Ibid.* (citing *Dames & Moore*, 453 U. S., at 673). The law thus "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" to resolve claims against European companies arising out of World War II. 530 U. S., at 381.[14]

*Crosby*'s facts are replicated again in the way HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen. The letters from Deputy Secretary Eizenstat to California officials show well enough how the portent of further litigation and sanctions has in fact placed the Government at a disadvantage in obtaining practical results from persuading "foreign governments and foreign companies to participate voluntarily in organizations such as ICHEIC." . Brief for United States as *Amicus Curiae* 15; see also SER 1267, 1272 (Joint Statement with Switzerland noting the "potentially disruptive and counterproductive effects" of laws like HVIRA and promising effort by

---

[14] It is true that the President in this case is acting without express congressional authority, and thus does not have the "plenitude of Executive authority" that "controll[ed] the issue of preemption" in *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 376 (2000). But in *Crosby* we were careful to note that the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, *id.*, at 381, and conflict with the exercise of that authority is a comparably good reason to find preemption of state law. .

the United States to call on state legislatures "to refrain
from taking unwarranted investigative initiatives or from
threatening or actually using sanctions against Swiss insur-
ers"). In addition to thwarting the Government's policy of
repose for companies that pay through the ICHEIC, Califor-
nia's indiscriminate disclosure provisions place a handicap on
the ICHEIC's effectiveness (and raise a further irritant to
the European allies) by undercutting European privacy pro-
tections. See ER 1182, 3131 (opinions of the German Gov-
ernment that public disclosure of all European insurance pol-
icies "is not permissible" under German privacy law); Brief
for United States as *Amicus Curiae* 18 (noting protests from
the German and Swiss Governments). It is true, of course,
as it is probably true of all elements of HVIRA, that the
disclosure requirement's object of obtaining compensation
for Holocaust victims is a goal espoused by the National Gov-
ernment as well. But "[t]he fact of a common end hardly
neutralizes conflicting means," *Crosby, supra,* at 379, and
here HVIRA is an obstacle to the success of the National
Government's chosen "calibration of force" in dealing with
the Europeans using a voluntary approach, 530 U. S., at 380.

### B

The express federal policy and the clear conflict raised by
the state statute are alone enough to require state law to
yield. If any doubt about the clarity of the conflict re-
mained, however, it would have to be resolved in the Na-
tional Government's favor, given the weakness of the State's
interest, against the backdrop of traditional state legisla-
tive subject matter, in regulating disclosure of European
Holocaust-era insurance policies in the manner of HVIRA.

The commissioner would justify HVIRA's ambitious dis-
closure requirement as protecting "legitimate consumer pro-
tection interests" in knowing which insurers have failed to
pay insurance claims. Brief for Respondent 1, 42–44. But,
quite unlike a generally applicable "blue sky" law, HVIRA

effectively singles out only policies issued by European companies, in Europe, to European residents, at least 55 years ago. Cal. Ins. Code Ann. § 13804(a) (West Cum. Supp. 2003); see also § 790.15(a) (mandating license suspension only for "fail[ure] to pay any valid claim from Holocaust survivors"). Limiting the public disclosure requirement to these policies raises great doubt that the purpose of the California law is an evaluation of corporate reliability in contemporary insuring in the State.

Indeed, there is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State. § 13801(d) (legislative finding that roughly 5,600 documented Holocaust survivors reside in California). But this fact does not displace general standards for evaluating a State's claim to apply its forum law to a particular controversy or transaction, under which the State's claim is not a strong one. "Even if a plaintiff evidences his desire for forum law by moving to the forum, we have generally accorded such a move little or no significance." *Phillips Petroleum Co.* v. *Shutts*, 472 U. S. 797, 820 (1985); see *Allstate Ins. Co.* v. *Hague*, 449 U. S. 302, 311 (1981) ("[A] postoccurrence change of residence to the forum State—standing alone—[i]s insufficient to justify application of forum law").

But should the general standard not be displaced, and the State's interest recognized as a powerful one, by virtue of the fact that California seeks to vindicate the claims of Holocaust survivors? The answer lies in recalling that the very same objective dignifies the interest of the National Government in devising its chosen mechanism for voluntary settlements, there being about 100,000 survivors in the country, only a small fraction of them in California. ER 870 (press release of insurance commissioner of California); Bazyler, 34 Rich. L. Rev., at 8, n. 11. As against the responsibility of the United States of America, the humanity underlying the

state statute could not give the State the benefit of any doubt in resolving the conflict with national policy.

## C

The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves. We have heard powerful arguments that the iron fist would work better, and it may be that if the matter of compensation were considered in isolation from all other issues involving the European Allies, the iron fist would be the preferable policy. But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict, and the evidence here is "more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives." *Crosby, supra,* at 386.

## V

The State's remaining submission is that even if HVIRA does interfere with Executive Branch foreign policy, Congress authorized state law of this sort in the McCarran-Ferguson Act, 59 Stat. 33, ch. 20, 15 U. S. C. §§ 1011–1015, and the more recent U. S. Holocaust Assets Commission Act of 1998 (Holocaust Commission Act), 112 Stat. 611, note following 22 U. S. C. § 1621. There is, however, no need to consider the possible significance for preemption doctrine of tension between an Act of Congress and Presidential foreign policy, cf. generally *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S., at 637–638 (Jackson, J., concurring in judgment and opinion of Court), for neither statute does the job the commissioner ascribes to it.

The provisions of the McCarran-Ferguson Act said to be relevant here specify that "[t]he business of insurance" shall be recognized as a subject of state regulation, 15 U. S. C.

§ 1012(a), which will be good against preemption by federal legislation unless that legislation "specifically relates to the business of insurance," § 1012(b); see also § 1011 (policy behind § 1012 is that "continued regulation and taxation by the several States of the business of insurance is in the public interest" and "silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States"). As the text itself makes clear, the point of McCarran-Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised. Compare *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, 429–430 (1946), with *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533 (1944); see *Department of Treasury* v. *Fabe,* 508 U. S. 491, 499–500 (1993). Quite apart, then, from any doubt whether HVIRA would qualify as regulating "the business of insurance" given its tangential relation to present-day insuring in the State, see *FTC* v. *Travelers Health Assn.,* 362 U. S. 293, 300–301 (1960) (McCarran-Ferguson was not intended to allow a State to "regulate activities carried on beyond its own borders"), a federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.

Nor does the Holocaust Commission Act authorize HVIRA. That Act set up a Presidential Commission to "study and develop a historical record of the collection and disposition" of Holocaust-era assets that "came into the possession or control of the Federal Government." Pub. L. 105–186, § 3(a)(1), 112 Stat. 612. For this purpose, Congress directed the Commission to "encourage the National Association of Insurance Commissioners to prepare a report on the Holocaust-related claims practices of all insurance companies, both domestic and foreign, doing business in the

United States at any time after January 30, 1933, that issued any individual life, health, or property-casualty insurance policy to any individual on any list of Holocaust victims." §3(a)(4)(A), 112 Stat. 613. These provisions are no help to HVIRA. The Commission's focus was limited to assets in the possession of the Government, and if anything, the federal Act assumed it was the National Government's responsibility to deal with returning those assets. See §3(d), 112 Stat. 614 (President to collect recommendations from the commission and submit a suggested plan for "legislative, administrative, or other action" to Congress). In any event, the federal Act's reference to the state insurance commissioners as compiling information was expressly limited "to the degree the information is available," §3(a)(4)(B), 112 Stat. 613, a proviso that can hardly be read to condone state sanctions interfering with federal efforts to resolve such claims.

Indeed, it is worth noting that Congress has done nothing to express disapproval of the President's policy. Legislation along the lines of HVIRA has been introduced in Congress repeatedly, but none of the bills has come close to making it into law. See H. R. 1210, 108th Cong., 1st Sess. (2003); S. 972, 108th Cong., 1st Sess. (2003); H. R. 2693, 107th Cong., 1st Sess. (2001); H. R. 126, 106th Cong., 1st Sess. (1999).

In sum, Congress has not acted on the matter addressed here. Given the President's independent authority "in the areas of foreign policy and national security, . . . congressional silence is not to be equated with congressional disapproval." *Haig* v. *Agee*, 453 U. S. 280, 291 (1981).

## VI

The judgment of the Court of Appeals for the Ninth Circuit is reversed.

*So ordered.*

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUS-
TICE SCALIA, and JUSTICE THOMAS join, dissenting.

Responding to Holocaust victims' and their descendents'
long-frustrated efforts to collect unpaid insurance proceeds,
California's Holocaust Victim Insurance Relief Act of 1999
(HVIRA), Cal. Ins. Code Ann. § 13800 *et seq.* (West Cum.
Supp. 2003), requires insurance companies operating in the
State to disclose certain information about insurance policies
they or their affiliates wrote in Europe between 1920 and
1945. In recent years, the Executive Branch of the Federal
Government has become more visible in this area, undertak-
ing foreign policy initiatives aimed at resolving Holocaust-
era insurance claims. Although the federal approach differs
from California's, no executive agreement or other formal
expression of foreign policy disapproves state disclosure laws
like the HVIRA. Absent a clear statement aimed at disclo-
sure requirements by the "one voice" to which courts prop-
erly defer in matters of foreign affairs, I would leave intact
California's enactment.

I

As the Court observes, *ante,* at 401–402, and n. 1, the Nazi
regimentation of inhumanity we characterize as the Holo-
caust, marked most horrifically by genocide and enslave-
ment, also entailed widespread destruction, confiscation, and
theft of property belonging to Jews. For insurance policies
issued in Germany and other countries under Nazi control,
historical evidence bears out, the combined forces of the Ger-
man Government and the insurance industry engaged in lar-
cenous takings of gigantic proportions. For example, in-
surance policies covered many of the Jewish homes and
businesses destroyed in the state-sponsored pogrom known
as Kristallnacht. By order of the Nazi regime, claims aris-
ing out of the officially enabled destruction were made pay-
able not to the insured parties, but to the State. M. Bazyler,
Holocaust Justice: The Battle for Restitution in America's
Courts 114 (2003). In what one historian called a "charade

concocted by insurers and ministerial officials," insurers satisfied property loss claims by paying the State only a fraction of their full value. G. Feldman, Allianz and the German Insurance Business, 1933–1945, p. 227 (2001); see Bazyler, *supra,* at 114; App. 27–28 (declaration of Rabbi Abraham Cooper, Assoc. Dean, Simon Wiesenthal Center) ("There is documentary evidence that the insurance companies paid only one-half of the Jewish insurance proceeds to the Reich and kept the other half for themselves.").

The Court depicts Allied diplomacy after World War II as aimed in part at settling confiscated and unpaid insurance claims. *Ante,* at 403. But the multilateral negotiations that produced the Potsdam, Yalta, and like accords failed to achieve any global resolution of such claims. European insurers, encountering no official compulsion, were themselves scarcely inclined to settle claims; turning claimants away, they relied on the absence of formal documentation and other technical infirmities that legions of Holocaust survivors were in no position to remedy. See, *e. g.,* Hearings on H. R. 2693 before the Subcommittee on Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 14–15 (2002) (statement of Rep. Waxman) ("Some survivors were rejected because they could not produce death certificates for loved ones who perished in Nazi concentration camps. Other insurance companies took advantage of the fact that claimants had no policy documents to prove their policy existed."). For over five decades, untold Holocaust-era insurance claims went unpaid. *Id.,* at 38 (statement of Leslie Tick, California Dept. of Insurance).

In the late 1990's, litigation in American courts provided a spur to action. See Bazyler, *supra,* at xi; Feldman, *supra,* at vii; Neuborne, Preliminary Reflections on Aspects of Holocaust-Era Litigation in American Courts, 80 Wash. U. L. Q. 795, 796 (2002). Holocaust survivors and their descendents initiated class-action suits against German and

other European firms seeking compensation for, *inter alia*, the confiscation of Jewish bank assets, the use of Jewish slave labor, and the failure to pay Jewish insurance claims. See generally Bazyler, *supra*, at 1–171.

In the insurance industry, the litigation propelled a number of European companies to agree on a framework for resolving unpaid claims outside the courts. This concord prompted the 1998 creation of the International Commission on Holocaust Era Insurance Claims (ICHEIC). A voluntary claims settlement organization, ICHEIC comprises several European insurers, Jewish and Holocaust survivor organizations, the State of Israel, and this country's National Association of Insurance Commissioners. See S. Eizenstat, Imperfect Justice 266 (2003); Bazyler, *supra*, at 132.

As the Court observes, *ante*, at 407, ICHEIC has formulated procedures for the filing, investigation, valuation, and resolution of Holocaust-era insurance claims. At least until very recently, however, ICHEIC's progress has been slow and insecure. See *In re Assicurazioni Generali S. p. A. Holocaust Ins. Litig.*, 228 F. Supp. 2d 348, 358 (SDNY 2002) (quoting a 2001 press account describing ICHEIC as having "repeatedly been at the point of collapse since its inception in 1998"). Initially, ICHEIC's insurance company members represented little more than one-third of the Holocaust-era insurance market. See App. 32 (declaration of Leslie Tick, California Dept. of Insurance) ("The five insurance company members of the ICHEIC represent approximately 35.5% of the pre-World War II European insurance market."); Eizenstat, *supra*, at 268 (despite repeated assurances that *all* German insurance companies would join ICHEIC, "[t]hey never have to this day"). Petitioners note that participation in ICHEIC has expanded in the past year, see Reply Brief 8–9, but it remains unclear whether ICHEIC does now or will ever encompass all relevant insurers.

Moreover, ICHEIC has thus far settled only a tiny proportion of the claims it has received. See Eizenstat, *supra*, at

267 ("ICHEIC's administrative failings led to few claims paid and large costs."). Evidence submitted in a series of class actions filed against Italian insurer Generali indicated that by November 2001, ICHEIC had resolved only 797 of 77,000 claims. See *In re Assicurazioni Generali*, 228 F. Supp. 2d, at 357. The latest reports show only modest increases. See Treaster, Holocaust List Is Unsealed by Insurers, N. Y. Times, Apr. 29, 2003, section A, p. 26, col. 6 ("In more than four years of operation [ICHEIC] has offered $38.2 million— or just short of the $40 million it had spent on expenses as of 18 months ago—to 3,006 claimants.").

Finally, although ICHEIC has directed its members to publish lists of unpaid Holocaust-era policies, that non-binding directive had not yielded significant compliance at the time this case reached the Court. See Brief for Respondent 10; Bazyler, Holocaust Justice, at 132 ("Using the ICHEIC process, the European insurers have been able to . . . avoid revealing the names of possible claim holders."). Shortly after oral argument, ICHEIC-participating German insurers made more substantial disclosures. See N. Y. Times, *supra*, at 26 (list of 363,232 names published in April 2003). But other insurers have been less forthcoming. For a prime example, Generali—which may have sold more life insurance and annuity policies in Eastern Europe during the Holocaust than any other company, see Bazyler, *supra*, at 113—reportedly maintains a 340,000-name list of persons to whom it sold insurance between 1918 and 1945, but has refused to disclose the bulk of the information on the list. See App. 37–38 (declaration of Leslie Tick, California Dept. of Insurance); Brief for Respondent 5.

## II

### A

California's disclosure law, the HVIRA, was enacted a year after ICHEIC's formation. Observing that at least 5,600 documented Holocaust survivors reside in California,

Cal. Ins. Code Ann. § 13801(d) (West Cum. Supp. 2003), the HVIRA declares that "[i]nsurance companies doing business in the State of California have a responsibility to ensure that any involvement they or their related companies may have had with insurance policies of Holocaust victims [is] disclosed to the state," § 13801(e). The HVIRA accordingly requires insurance companies doing business in California to disclose information concerning insurance policies they or their affiliates sold in Europe between 1920 and 1945, § 13804(a), and directs California's Insurance Commissioner to store the information in a publicly accessible "Holocaust Era Insurance Registry," § 13803. The Commissioner is further directed to suspend the license of any insurer that fails to comply with the HVIRA's reporting requirements. § 13806.

These measures, the HVIRA declares, are "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f). Information published in the HVIRA's registry could, for example, reveal to a Holocaust survivor residing in California the existence of a viable claim, which she could then present to ICHEIC for resolution.[1]

The Court refers, *ante*, at 408–409, 426, to a number of other California statutory provisions enabling the litigation

---

[1] In addition, California may deem an insurer's or its affiliate's continuing failure to resolve Holocaust-era claims relevant marketplace information for California consumers. See Brief for Respondent 42–44; Brief for National Association of Insurance Commissioners as *Amicus Curiae* 11–13. The Court discounts the HVIRA's pursuit of this objective, stressing that the HVIRA covers only certain policies issued in Europe more than 50 years ago. *Ante*, at 425–426. But States have broad authority to regulate the insurance industry, *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.*, 451 U. S. 648, 653–655 (1981), and a State does not exceed that authority by assigning special significance to an insurer's treatment of claims arising out of an era in which government and industry collaborated to rob countless Holocaust victims of their property.

of Holocaust-era insurance claims in California courts. Those provisions, it bears emphasis, are not at issue here. The HVIRA imposes no duty to pay any claim, nor does it authorize litigation on any claim. It mandates only information *disclosure*, and our assessment of the HVIRA is properly confined to that requirement alone.

### B

The Federal Government, after prolonged inaction, has responded to the Holocaust-era insurance issue by diplomatic means. Executive agreements with Germany, Austria, and France, the Court observes, are the principal expressions of the federal approach. *Ante*, at 413. Signed in July 2000, the German Foundation Agreement establishes a voluntary foundation, funded by public and private sources, to address Holocaust-era claims. Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).[2] "[I]t would be in the interests of both parties," the agreement declares, "for the Foundation to be the exclusive remedy and forum for addressing . . . all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." *Id.*, at 1299. In the case of insurance, the agreement endorses ICHEIC as the appropriate forum for claims resolution. *Ibid.*

The German Foundation Agreement commits the Federal Government to certain conduct. It provides, for example, that when a German company is sued in a United States court on a Holocaust-era claim, the Federal Government will file with the court a statement that "the President of the United States has concluded that it would be in the foreign policy interests of the United States for the [German] Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising

---

[2] The executive agreements with Austria and France are comparable. See *ante*, at 408, and n. 3.

from their involvement in the National Socialist era and World War II." *Id.*, at 1303. The agreement also provides that "[t]he United States will recommend dismissal on any valid legal ground (which, under the U. S. system of jurisprudence, will be for the U. S. courts to determine)." *Ibid.* The agreement makes clear, however, that "[t]he United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal." *Id.*, at 1304.

## III

### A

The President's primacy in foreign affairs, I agree with the Court, empowers him to conclude executive agreements with other countries. *Ante*, at 415. Our cases do not catalog the subject matter meet for executive agreement,[3] but we have repeatedly acknowledged the President's authority to make such agreements to settle international claims. *Ante*, at 415–416. And in settling such claims, we have recognized, an executive agreement may preempt otherwise permissible state laws or litigation. *Ante*, at 416–417. The executive agreements to which we have accorded preemptive effect, however, warrant closer inspection than the Court today endeavors.

In *United States* v. *Belmont*, 301 U. S. 324 (1937), the Court addressed the Litvinov Assignment, an executive agreement incidental to the United States' recognition of the Soviet Union. Under the terms of the agreement, the Soviet Union assigned to the United States all its claims against American nationals, including claims against New

---

[3] "One is compelled to conclude that there are agreements which the President can make on his sole authority and others which he can make only with the consent of the Senate (or of both houses), but neither Justice Sutherland [in *United States* v. *Belmont*, 301 U. S. 324 (1937)] nor any one else has told us which are which." L. Henkin, Foreign Affairs and the United States Constitution 222 (2d ed. 1996).

York banks holding accounts of Russian nationals that the Soviet Government had earlier nationalized. The Federal Government sued to recover the accounts thus assigned to it. Applying New York law, the lower courts refused to enforce the assignment; those courts held that the account-nationalization upon which the assignment rested contravened public policy. *Id.,* at 325–327. This Court reversed, concluding that "no state policy can prevail against the international compact here involved." *Id.,* at 327. The Litvinov Assignment clearly assigned to the United States the claims in issue; the enforceability of that assignment, the Court stressed, "is not and cannot be subject to any curtailment or interference on the part of the several states." *Id.,* at 331.

*United States* v. *Pink,* 315 U. S. 203 (1942), again addressed state-imposed obstacles to the Litvinov Assignment. Reiterating its holding in *Belmont,* the Court confirmed that no State may "deny enforcement of a claim under the Litvinov Assignment because of an overriding policy of the State." 315 U. S., at 222. Pointing both to the assignment itself and to a later exchange of diplomatic correspondence clarifying its scope, see *id.,* at 224–225, and n. 7, the Court saw no "serious doubt that claims of the kind here in question were included" in the "broad and inclusive" assignment, *id.,* at 224.

Four decades later, in *Dames & Moore* v. *Regan,* 453 U. S. 654 (1981), the Court gave effect to an executive agreement arising out of the Iran hostage crisis. One of the agreement's announced "purpose[s]" was "to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." *Id.,* at 665 (quoting the agreement). The agreement called for the formation of an Iran-United States Claims Tribunal to arbitrate claims not settled within six months. *Ibid.* In addition, under the agreement the United States undertook

> "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." *Ibid.* (internal quotation marks omitted).

In line with these firm commitments, the Court held that the agreement and the executive order implementing it validly "suspended" litigation in United States courts against Iranian interests. See *id.*, at 686–688.

Notably, the Court in *Dames & Moore* was emphatic about the "narrowness" of its decision. *Id.,* at 688. "We do not decide," the Court cautioned, "that the President possesses plenary power to settle claims, even as against foreign governmental entities." *Ibid.* Before sustaining the President's action, the Court determined: (1) Congress "had implicitly approved" the practice of claim settlement by executive agreement, *id.*, at 680; (2) the alternative forum created under the executive agreement was "capable of providing meaningful relief," *id.*, at 687; (3) Congress had not in any way disapproved or resisted the President's action, *id.*, at 687–688; and (4) the settlement of claims was "a necessary incident to the resolution of a major foreign policy dispute between our country and another," *id.*, at 688.

Together, *Belmont, Pink,* and *Dames & Moore* confirm that executive agreements directed at claims settlement may sometimes preempt state law. The Court states that if the executive "agreements here had expressly preempted laws like HVIRA, the issue would be straightforward." *Ante,* at 416–417. One can safely demur to that statement, for, as the Court acknowledges, no executive agreement before us expressly preempts the HVIRA. *Ante,* at 417. Indeed, no agreement so much as mentions the HVIRA's sole concern: public disclosure.

B

Despite the absence of express preemption, the Court holds that the HVIRA interferes with foreign policy objectives implicit in the executive agreements. See *ibid.* I would not venture down that path.

The Court's analysis draws substantially on *Zschernig* v. *Miller*, 389 U. S. 429 (1968). In that case, the Oregon courts had applied an Oregon escheat statute to deny an inheritance to a resident of a Communist bloc country. The Oregon courts so ruled because the claimant failed to satisfy them that his country's laws would allow U. S. nationals to inherit estates, nor had the claimant shown he would actually receive payments from the Oregon estate with no confiscation by his home government. *Id.*, at 432. Applying Oregon's statutory conditions, the Court concluded, required Oregon courts to "launc[h] inquiries into the type of governments that obtain in particular foreign nations," *id.*, at 434, rendering "unavoidable judicial criticism of nations established on a more authoritarian basis than our own," *id.*, at 440. Such criticism had a "direct impact upon foreign relations," the Court said, *id.*, at 441, and threatened to "impair the effective exercise of the Nation's foreign policy," *id.*, at 440. The Court therefore held the statute unconstitutional as applied in that case. *Id.*, at 433–434. But see *id.*, at 432 ("We do not accept the invitation to re-examine our ruling in *Clark* v. *Allen* [331 U. S. 503 (1947)]," which held a substantively similar California statute facially constitutional.).

We have not relied on *Zschernig* since it was decided, and I would not resurrect that decision here. The notion of "dormant foreign affairs preemption" with which *Zschernig* is associated resonates most audibly when a state action "reflect[s] a state policy critical of foreign governments and involve[s] 'sitting in judgment' on them." L. Henkin, Foreign Affairs and the United States Constitution 164 (2d ed. 1996); see Constitutionality of South African Divestment Statutes Enacted by State and Local Governments, 10 Op. Off. Legal

Counsel 49, 50 (1986) ("[W]e believe that *[Zschernig]* represents the Court's reaction to a particular regulatory statute, the operation of which intruded extraordinarily deeply into foreign affairs."). The HVIRA entails no such state action or policy. It takes no position on any contemporary foreign government and requires no assessment of any existing foreign regime. It is directed solely at private insurers doing business in California, and it requires them solely to disclose information in their or their affiliates' possession or control. I would not extend *Zschernig* into this dissimilar domain.[4]

Neither would I stretch *Belmont, Pink,* or *Dames & Moore* to support implied preemption by executive agreement. In each of those cases, the Court gave effect to the express terms of an executive agreement. In *Dames & Moore,* for example, the Court addressed an agreement explicitly extinguishing certain suits in domestic courts. 453 U. S., at 665; see *supra,* at 437–438. Here, however, none of the executive agreements extinguish any underlying claim for relief. See Neuborne, 80 Wash. U. L. Q., at 824, n. 101. The United States has agreed to file precatory statements advising courts that dismissing Holocaust-era claims accords with American foreign policy, but the German Foundation Agreement confirms that such statements have no legally binding effect. See 39 Int'l Legal Materials, at 1304; *supra,* at 436. It remains uncertain, therefore, whether even *litigation* on Holocaust-era insurance claims must be abated in deference to the German Foundation Agreement or the parallel agreements with Austria and France. Indeed, ambigu-

---

[4] The Court also places considerable weight on *Crosby* v. *National Foreign Trade Council,* 530 U. S. 363 (2000). As the Court acknowledges, however, *ante,* at 423, *Crosby* was a statutory preemption case. The state law there at issue posed "an obstacle to the accomplishment of Congress's full objectives under the [relevant] federal Act." 530 U. S., at 373. That statutory decision provides little support for preempting a state law by inferring preclusive foreign policy objectives from precatory language in executive agreements.

ity on this point appears to have been the studied aim of the American negotiating team. See Eizenstat, Imperfect Justice, at 272–273 (describing the "double negative" that satisfied German negotiators and preserved the flexibility sought by Justice Department litigators).

If it is uncertain whether insurance *litigation* may continue given the executive agreements on which the Court relies, it should be abundantly clear that those agreements leave *disclosure* laws like the HVIRA untouched. The contrast with the Litvinov Assignment at issue in *Belmont* and *Pink* is marked. That agreement spoke directly to claim assignment in no uncertain terms; *Belmont* and *Pink* confirmed that state law could not invalidate the very assignments accomplished by the agreement. See *supra*, at 436–437. Here, the Court invalidates a state disclosure law on grounds of conflict with foreign policy "embod[ied]" in certain executive agreements, *ante*, at 417, although those agreements do not refer to state disclosure laws specifically, or even to information disclosure generally.[5] It therefore is surely an exaggeration to assert that the "HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen" to resolve Holocaust-era claims. *Ante*, at 424. If that were so, one might expect to find some reference to laws like the HVIRA in the later-in-time executive agreements. There is none.

To fill the agreements' silences, the Court points to statements by individual members of the Executive Branch. See *ante*, at 411 (letters from Deputy Secretary of the Treas-

---

[5] The Court apparently finds in the executive agreements' "express endorsement of ICHEIC's voluntary mechanism" a federal purpose to preempt any information disclosure mechanism not controlled by ICHEIC itself. *Ante*, at 423, n. 13. But nothing in the executive agreements suggests that the Federal Government supports the resolution of Holocaust-era insurance claims only to the extent they are based upon information disclosed by ICHEIC. The executive agreements do not, for example, prohibit recourse to ICHEIC to resolve claims based upon information disclosed through laws like the HVIRA.

ury Stuart Eizenstat to California Governor Gray Davis and the Insurance Commissioner of California); *ante,* at 422 (testimony before Congress by Eizenstat, stating that a company's participation in ICHEIC should give it "safe haven from sanctions, subpoenas, and hearings relative to the Holocaust period" (internal quotation marks omitted)). But we have never premised foreign affairs preemption on statements of that order. Cf. *Barclays Bank PLC* v. *Franchise Tax Bd. of Cal.,* 512 U. S. 298, 329–330 (1994) ("Executive Branch actions—press releases, letters, and *amicus* briefs"—that "express federal policy but lack the force of law" cannot render a state law unconstitutional under the Foreign Commerce Clause.). We should not do so here lest we place the considerable power of foreign affairs preemption in the hands of individual sub-Cabinet members of the Executive Branch. Executive officials of any rank may of course be expected "faithfully [to] represen[t] the President's chosen policy," *ante,* at 423, n. 13, but no authoritative text accords such officials the power to invalidate state law simply by conveying the Executive's views on matters of federal policy. The displacement of state law by preemption properly requires a considerably more formal and binding federal instrument.

Sustaining the HVIRA would not compromise the President's ability to speak with one voice for the Nation. See *ante,* at 424. To the contrary, by declining to invalidate the HVIRA in this case, we would reserve foreign affairs preemption for circumstances where the President, acting under statutory or constitutional authority, has spoken clearly to the issue at hand. "[T]he Framers did not make the judiciary the overseer of our government." *Dames & Moore,* 453 U. S., at 660 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 U. S. 579, 594 (1952) (Frankfurter, J., concurring)). And judges should not be the expositors of the Nation's foreign policy, which is the role they play by acting when the President himself has not taken a clear

stand. As I see it, courts step out of their proper role when they rely on no legislative or even executive text, but only on inference and implication, to preempt state laws on foreign affairs grounds.

In sum, assuming, *arguendo*, that an executive agreement or similarly formal foreign policy statement targeting disclosure could override the HVIRA, there is no such declaration here. Accordingly, I would leave California's enactment in place, and affirm the judgment of the Court of Appeals.