ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

October 20, 2003

The Honorable Rodney Ellis
Chair, Government Organization Committee
Texas State Senate
P.O. Box 12068
Austin, Texas 78711-2068

Mr. José Montemayor
Commissioner of Insurance
Texas Department of Insurance
P.O. Box 149104
Austin, Texas 78714-9104

Opinion No. GA-0116

Re: Constitutionality of sections 2A and 2B of
article 21.74, Texas Insurance Code, which
establish a "Holocaust Registry" within the Texas
Department of Insurance; require certain insurers
to file particular information with the Department;
and authorize the imposition of sanctions for
failure to do so (RQ-0074-GA)

Dear Senator Ellis and Commissioner Montemayor:

You ask about the constitutionality of article 21.74, sections 2A and 2B of the Texas
Insurance Code. Those provisions establish a "Holocaust Registry" within the Texas Department
of Insurance (the "Department"); require certain insurers to file particular information with the
Department; and authorize the imposition of sanctions for failure to do so.

I.    Legislation

A.    The 2001 Legislation

In 2001, the legislature enacted article 21.74 of the Texas Insurance Code,[1] which
authorized that "a Holocaust victim, or the heir, assignee, beneficiary, or successor of a Holocaust
victim, who resides in this state and has a claim arising out of an insurance policy purchased or in
effect in Europe before 1946 that was delivered, issued for delivery, or renewed by an insurer may
bring an action against an insurer to recover on that claim in a court of competent jurisdiction in this
state." TEX. INS. CODE ANN. art. 21.74, § 2(a) (Vernon Supp. 2003). "Holocaust victim" was
defined as "a person who was killed or injured, or who lost real or personal property or financial
assets, as the result of discriminatory laws, policies, or actions directed against any discrete group
of which the person was a member, during the period of 1920 to 1945, inclusive, in Germany, areas

---

[1]Effective April 1, 2005, article 21.74 is repealed and recodified in title 5, chapter 553, Insurance Code. See
Act of May 22, 2003, 78th Leg., R.S., ch. 1274, 2003 Tex. Sess. Law. Serv. 3611, 3715-16 (nonsubstantive revision of
Insurance Code).

occupied by Germany, or countries allied with Germany." Act of May 15, 2001, 77th Leg., R.S., ch. 391, § 1, sec. 1(1), 2001 Tex. Gen. Laws 718. "Insurer" was defined as

> an insurance company or other entity engaged in the business of insurance or reinsurance in this state. The term includes:
>
> (A) a capital stock company, a mutual company, or a Lloyd's plan; and
>
> (B) any parent, subsidiary, or affiliated company, at least 50 percent of the stock of which is in common ownership with an insurer engaged in the business of insurance in this state.

*Id.* § 1, sec. 1(2).

The statute further provided that "[a]n action brought under Subsection (a) of [section 2] may not be dismissed for failure to comply with any applicable limitations period if the action is brought before December 31, 2012." TEX. INS. CODE ANN. art. 21.74, § 2(b) (Vernon Supp. 2003). Article 21.74, section 3(a) declared that "[f]ailure by an insurer to comply with a claim brought under this article by denying the claim on the grounds that the claim is not timely or by asserting a statute of limitations defense in an action brought under Section 2(a) of this article constitutes a violation of this article." *Id.* § 3(a). Section 3(c) authorized the commissioner of insurance (the "commissioner"), if he believed that a violation of article 21.74 had occurred or was occurring, to "(1) impose sanctions under Chapter 82 of this code; (2) issue a cease and desist order under Chapter 83 of this code; (3) assess an administrative penalty under Chapter 84 of this code; or (4) refer the matter to the attorney general for appropriate enforcement." *Id.* § 3(c).

Chapter 82 permits the commissioner, "[a]fter notice and opportunity for a hearing," to "cancel or revoke an authorization if the holder of the authorization is found to be in violation of, or to have failed to comply with, this code or a rule of the commissioner." TEX. INS. CODE ANN. § 82.051 (Vernon 2003). "Authorization" is defined as "a permit, license, certificate of authority, certificate of registration, or other authorization issued or existing under the commissioner's authority or this code." *Id.* § 82.001. Thus, under article 21.74 as it existed in 2001, the commissioner was empowered to cancel or revoke the license of any insurer who failed to "comply with a claim brought under this article" by "asserting a statute of limitations defense" against such a claim. TEX. INS. CODE ANN. art. 21.74, § 3(a) (Vernon Supp. 2003).

### B.     The 2003 Legislation

In 2003, as part of Senate Bill 14, an omnibus insurance bill, the legislature enacted several substantive amendments to article 21.74 of the Insurance Code. Those amendments were adopted on May 23, 2003, during Senate Bill 14's second reading on the floor of the House of Representatives. First, the bill added to the definition of "Holocaust victim" any person who

suffered death, injury, or property damage in "countries that were sympathizers with Germany." Act of June 2, 2003, 78th Leg., R.S., ch. 206, § 12.04, 2003 Tex. Sess. Law Serv. 907, 944 (to be codified at TEX. INS. CODE ANN. art. 21.74, § 1(1)). The legislation also added to the definition of "insurer" any "reinsurer, successor in interest, [or] managing general agent." *Id.* (to be codified at TEX. INS. CODE ANN. art. 21.74, § 1(2)). Most significantly, the bill added sections 2A and 2B, which provide:

> Sec. 2A. FILINGS AND CERTIFICATES OF INSURANCE. (a) This section applies to each insurer engaging in business in the state that, directly or through a related company, sold to persons in Europe insurance policies described by Section 1 of this article or dowry or educational insurance policies that were in effect during the period of 1920 to 1945, whether the sale occurred before or after the insurer and the related company became related.
>
> (b) Each insurer shall file or cause to be filed with the commissioner the following information:
>
> > (1) the number of insurance policies described by Subsection (a) of this section sold by the insurer or a related company;
> >
> > (2) the holder, beneficiary, and current status of the policies; and
> >
> > (3) the city of origin, domicile, or address for each policyholder listed in the policies.
>
> (c) Each insurer shall certify:
>
> > (1) that the proceeds of the policies described by Subsection (a) of this section have been paid to the designated beneficiaries or their heirs in circumstances in which that person or those persons, after diligent search, could be located and identified;
> >
> > (2) that the proceeds of the policies, in circumstances in which the beneficiaries or heirs could not, after diligent search, be located or identified, have been distributed to Holocaust survivors or to qualified charitable nonprofit organizations for the purpose of assisting Holocaust survivors;

(3) that a court of law has certified in a legal proceeding resolving the rights of unpaid policyholders and their heirs and beneficiaries a plan for the distribution of the proceeds; or

(4) that the proceeds have not been distributed and the amount of those proceeds.

(d) The commissioner by rule shall require that insurers update the information submitted to the commissioner under this section at reasonable intervals.

Sec. 2B. ESTABLISHMENT AND MAINTENANCE OF REGISTRY; PUBLIC ACCESS. (a) The commissioner shall establish and maintain within the department a central registry containing records and information relating to insurance policies described by Section 2A(a) of this article of Holocaust victims, living and deceased. The registry shall be known as the Holocaust Era Insurance Registry.

(b) The commissioner by rule shall establish appropriate mechanisms to ensure public access to the registry.

(c) Information contained in the registry:

(1) is public information;

(2) is not subject to any exceptions to disclosure under Chapter 552, Government Code; and

(3) cannot be withheld from disclosure under any other law.

*Id.* § 12.05 (to be codified at TEX. INS. CODE ANN. art. 21.74, §§ 2A-2B) . These provisions thus require every insurer doing business in Texas to file specific information with the commissioner, including the names of "the holder, beneficiary, and current status" of any policy sold in Europe and in effect between 1920 and 1945, and "the city of origin, domicile, or address for each" listed policyholder. *Id.* In addition, an insurer must make particular certifications to the commissioner regarding the distribution, or non-distribution, or the proceeds of those policies.

By virtue of the enforcement provisions of article 21.74 enacted in 2001, the commissioner may now impose sanctions under chapter 82 against any insurer who fails to file with the Department the information required under section 2A of article 21.74, including cancellation or revocation of a license to do business in this state. Section 12.07 of Senate Bill 14 provides that "[n]ot later than the 180th day after the effective date" of Senate Bill 14, "an insurer subject to Article 21.74,

Insurance Code, as amended by this Act, shall file the information and certification required by section 2A of this article." *Id.* § 12.07. Senate Bill 14 became effective upon the Governor's signature on June 11, 2003. Consequently, the filings required by article 21.74, section 2A must begin no later than December 8, 2003, the 180th day after the effective date of Senate Bill 14.

## II.    American Insurance Association v. Garamendi

Recently, the United States Supreme Court considered a California statute on which you indicate that Senate Bill 14 was "largely patterned."[2] We must therefore address that decision in some detail.

The California statute, enacted in 1999, permitted state residents "to sue in state court on insurance claims based on acts perpetrated in the Holocaust and extended the governing statute of limitations to December 31, 2010." *Am. Ins. Ass'n v. Garamendi*, 123 S.Ct. 2374, 2383 (2003). The statute also required "'[a]ny insurer currently doing business in the state' to disclose the details of 'life, property, liability, health, annuities, dowry, educational, or casualty insurance policies' issued 'to persons in Europe, which were in effect between 1920 and 1945.'" *Id.* at 2383. An insurer's duties included "disclosure not only about policies the particular insurer sold, but also about those sold by any 'related company,' . . . including 'any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer' . . . whether or not the companies were related during the time when the policies subject to disclosure were sold." *Id.* at 2384. Moreover, an insurer was required to "report the current status of each policy, the city of origin, domicile, or address of each policyholder, and the names of the beneficiaries . . . all of which is to be put in a central registry open to the public." *Id.*

In considering the constitutionality of the California statute, the Court first noted that, "given the 'concern for uniformity in this country's dealings with foreign nations,'" "an exercise of state power that touches on foreign relations must yield to the National Government's policy." *Id.* at 2386. "Nor," the Court said, "is there any question generally that there is executive authority to decide what that policy should be." *Id.* "[O]ur cases have recognized that the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress." *Id.* "Given the fact that the practice goes back over 200 years to the first Presidential administration, and has received congressional acquiescence throughout its history, the conclusion '[t]hat the President's control of foreign relations includes the settlement of claims is indisputable.'" *Id.* at 2387.

With regard to insurance claims by Holocaust victims, President Clinton and German Chancellor Schröder, in July 2000, entered into the "German Foundation Agreement . . . in which Germany agreed to enact legislation establishing a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies, to be used to compensate

---

[2]Letter from Honorable Rodney Ellis, Chair, Senate Government Organization Committee, and from José Montemayor, Commissioner of Insurance, Texas Department of Insurance, to Honorable Greg Abbott, Texas Attorney General (July 1, 2003) (on file with Opinion Committee) [hereinafter Request Letter].

all those 'who suffered at the hands of German companies during the National Socialist era.'" *Id.* at 2381. President Clinton "put his weight behind two specific measures" to guarantee to the German government and to German corporations "some expectation of security from lawsuits in United States courts." *Id.* at 2382. The Court continued:

> First, the Government agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government of the United States would submit a statement that "it would be in the foreign policy interests of the United States for the [German] Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II." . . . . Though unwilling to guarantee that its foreign policy interests would "in themselves provide an independent legal basis for dismissal," that being an issue for the courts, the Government agreed to tell courts "that U.S. policy interests favor dismissal on any valid legal ground." . . . . On top of that undertaking, the Government promised to use its "best efforts, in a manner it considers appropriate," to get state and local governments to respect the foundation as the exclusive mechanism. . . .
>
> As for insurance claims specifically, both countries agreed that the German Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization formed in 1998 by several European insurance companies, the State of Israel, Jewish and Holocaust survivor associations, and the National Association of Insurance Commissioners, the organization of American state insurance commissioners. The job of the ICHEIC . . . includes negotiation with European insurers to provide information about unpaid insurance policies issued to Holocaust victims and settlement of claims brought under them. It has thus set up procedures for handling demands against participating insurers, including "a reasonable review . . . of the participating companies' files" for production of unpaid policies, "an investigatory process to determine the current status" of insurance policies for which claims are filed, and a "claims and valuation process to settle and pay individual claims," employing "relaxed standards of proof."

*Id.* (citations omitted) (footnotes omitted). Although the Court acknowledged that "[t]he executive agreements at issue here do differ in one respect" from earlier executive agreements, "insofar as they address claims associated with formerly belligerent states, but against corporations, not the foreign governments," it found that "the distinction does not matter." *Id.* at 2387.

The Court summarized its findings as follows:

> [R]esolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, . . . there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries . . . . The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

*Id.* at 2390 (citations omitted). As a result, "[t]he exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two. The foregoing account of negotiations toward the three settlement agreements is enough to illustrate that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions." *Id.*

The Court concluded that the California statute's

> compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, employs a "different, state system of economic pressure," and in doing so undercuts the President's diplomatic discretion and the choice he has made exercising it. . . . Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, . . . [the California statute] denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own policies on disclosure. . . . The law thus "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" to resolve claims against European companies arising out of World War II.

*Id.* at 2391-92 (citations omitted) (footnote omitted). Thus, the California statute, by authorizing unconstitutional interference with the President's conduct of foreign affairs, was preempted by federal law.

## III.     Conclusion

As you note in your letter, article 21.74 of the Insurance Code is modeled on the California statute that was struck down in *Garamendi*. *See* Request Letter, *supra* note 2. Both statutes permit Holocaust victims to file actions against any insurers, their parents, subsidiaries and affiliates, that sold policies in Europe between 1920 and 1945. *Compare* CAL. CIV. PROC. CODE ANN. § 354.5(b) (West Cum. Supp. 2003), *with* TEX. INS. CODE ANN. art. 21.74, § 2(a) (Vernon Supp. 2003). Both extend the statute of limitations for filing such claims through the end of 2010[3] or 2012[4], and permit the imposition of sanctions against an insurance company for not complying with the Act. *Compare* CAL. INS. CODE ANN. §§ 13805-13806 (West Cum. Supp. 2003), *with* TEX. INS. CODE ANN. art. 21.74, § 3 (Vernon Supp. 2003). Both require insurers, their parents, subsidiaries, and affiliates that sold such policies to file with the state insurance commissioner detailed information about those policies, including the names of the holders and beneficiaries, the current status of the policies, and the city of origin, domicile, or address for each listed policyholder. *Compare* CAL. INS. CODE ANN. § 13804(a) (West Cum. Supp. 2003), *with* Act of June 2, 2003, 78th Leg., R.S., ch. 206, § 12.05, sec. 2A, 2003 Tex. Sess. Law Serv. 907, 944 (to be codified at TEX. INS. CODE ANN. art. 21.74, § 2A(a)-(b)). Both impose sanctions, including cancellation or revocation of an insurer's license to do business in the state, upon failure to file the information within a specified period. *Compare* CAL. INS. CODE ANN. §§ 13805-13806 (West. Cum. Supp. 2003), *with* TEX. INS. CODE ANN. art. 21.74, § 3(c) (Vernon Supp. 2003). And both declare that the information so filed is open to the public. *Compare* CAL. INS. CODE ANN. § 13803 (West. Cum. Supp. 2003), *with* Act of June 2, 2003, 78th Leg., R.S., ch. 206, § 12.05, sec. 2B(c), 2003 Tex. Sess. Law Serv. 907, 944 (to be codified at TEX. INS. CODE ANN. art. 21.74, § 2B(c)).

In view of the virtually identical provisions of the California and Texas statutes, we conclude that, on the basis of *Garamendi*, article 21.74 of the Texas Insurance Code interferes with the President's conduct of foreign affairs, and is thus preempted by the United States Constitution.

---

[3]*See* CAL. CIV. PROC. ANN. § 354.5(c) (West Cum. Supp. 2003).

[4]*See* TEX. INS. CODE ANN. art. 21.74, § 2(b) (Vernon Supp. 2003).

# S U M M A R Y

On the basis of the United States Supreme Court's decision in *American Insurance Association v. Garamendi*, 123 S.Ct. 2374 (2003), article 21.74 of the Texas Insurance Code interferes with the President's conduct of foreign affairs, and is thus preempted by the United States Constitution.

Yours very truly,

GREG ABBOTT
Attorney General of Texas

BARRY R. MCBEE
First Assistant Attorney General

DON R. WILLETT
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Rick Gilpin
Assistant Attorney General, Opinion Committee