# Authority to Use Military Force in Libya

The President had the constitutional authority to direct the use of military force in Libya because he could reasonably determine that such use of force was in the national interest.

Prior congressional approval was not constitutionally required to use military force in the limited operations under consideration.

April 1, 2011

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum memorializes advice this Office provided to you, prior to the commencement of recent United States military operations in Libya, regarding the President's legal authority to conduct such operations. For the reasons explained below, we concluded that the President had the constitutional authority to direct the use of force in Libya because he could reasonably determine that such use of force was in the national interest. We also advised that prior congressional approval was not constitutionally required to use military force in the limited operations under consideration.

## I.

In mid-February 2011, amid widespread popular demonstrations seeking governmental reform in the neighboring countries of Tunisia and Egypt, as well as elsewhere in the Middle East and North Africa, protests began in Libya against the autocratic government of Colonel Muammar Qadhafi, who has ruled Libya since taking power in a 1969 coup. Qadhafi moved swiftly in an attempt to end the protests using military force. Some Libyan government officials and elements of the Libyan military left the Qadhafi regime, and by early March, Qadhafi had lost control over much of the eastern part of the country, including the city of Benghazi. The Libyan government's operations against its opponents reportedly included strafing of protesters and shelling, bombing, and other violence deliberately targeting civilians. Many refugees fled to Egypt and other neighboring countries to escape the violence, creating a serious crisis in the region.

On February 26, 2011, the United Nations Security Council ("UNSC") unanimously adopted Resolution 1970, which "[e]xpress[ed] grave con-

cern at the situation in the Libyan Arab Jamahiriya," "condemn[ed] the violence and use of force against civilians," and "[d]eplor[ed] the gross and systematic violation of human rights" in Libya. S.C. Res. 1970, U.N. Doc. S/RES/1970 (Feb. 26, 2011); Press Release, Security Council, *In Swift, Decisive Action, Security Council Imposes Tough Measures on Libyan Regime, Adopting Resolution 1970 in Wake of Crackdown on Protesters*, U.N. Press Release SC/10187/Rev. 1 (Feb. 26, 2011). The resolution called upon member states, among other things, to take "the necessary measures" to prevent arms transfers "from or through their territories or by their nationals, or using their flag vessels or aircraft"; to freeze the assets of Qadhafi and certain other close associates of the regime; and to "facilitate and support the return of humanitarian agencies and make available humanitarian and related assistance" in Libya. S.C. Res. 1970, ¶¶ 9, 17, 26. The resolution did not, however, authorize members of the United Nations to use military force in Libya.

The Libyan government's violence against civilians continued, and even escalated, despite condemnation by the UNSC and strong expressions of disapproval from other regional and international bodies. *See, e.g.*, African Union, Communique of the 265th Meeting of the Peace and Security Council, PSC/PR/COMM.2(CCLXV) (Mar. 10, 2011) (describing the "prevailing situation in Libya" as "pos[ing] a serious threat to peace and security in that country and in the region as a whole" and "[r]eiterat[ing] AU's strong and unequivocal condemnation of the indiscriminate use of force and lethal weapons"); News Release, Organization of the Islamic Conference, *OIC General Secretariat Condemns Strongly the Excessive Use of Force Against Civilians in the Libyan Jamahiriya* (Feb. 22, 2011), http://www.oic-oci.org/topic_detail.asp?t_id=4947&x_key= (last visited ca. Apr. 2011) (reporting that "the General Secretariat of the Organization of the Islamic Conference (OIC) voiced its strong condemnation of the excessive use of force against civilians in the Arab Libyan Jamahiriya"). On March 1, 2011, the United States Senate passed by unanimous consent Senate Resolution 85. Among other things, the Resolution "strongly condemn[ed] the gross and systematic violations of human rights in Libya, including violent attacks on protesters demanding democratic reforms," "call[ed] on Muammar Gadhafi to desist from further violence," and "urge[d] the United Nations Security Council to take such further action as may be necessary to protect civilians in Libya

from attack, including the possible imposition of a no-fly zone over Libyan territory." S. Res. No. 112-85, §§ 2, 3, 7 (as passed by Senate, Mar. 1, 2011). On March 12, the Council of the League of Arab States similarly called on the UNSC "to take the necessary measures to impose immediately a no-fly zone on Libyan military aviation" and "to establish safe areas in places exposed to shelling as a precautionary measure that allows the protection of the Libyan people and foreign nationals residing in Libya, while respecting the sovereignty and territorial integrity of neighboring States." League of Arab States, *The Outcome of the Council of the League of Arab States Meeting at the Ministerial Level in Its Extraordinary Session on the Implications of the Current Events in Libya and the Arab Position*, Res. No. 7360, ¶ 1 (Mar. 12, 2011).

By March 17, 2011, Qadhafi's forces were preparing to retake the city of Benghazi. Pledging that his forces would begin an assault on the city that night and show "no mercy and no pity" to those who would not give up resistance, Qadhafi stated in a radio address: "We will come house by house, room by room. It's over. The issue has been decided." Dan Bilefsky & Mark Landler, *Military Action Against Qaddafi Is Backed by U.N.*, N.Y. Times, Mar. 18, 2011, at A1. Qadhafi, President Obama later noted, "compared [his people] to rats, and threatened to go door to door to inflict punishment. . . . We knew that if we . . . waited one more day, Benghazi, a city nearly the size of Charlotte, could suffer a massacre that would have reverberated across the region and stained the conscience of the world." Press Release, Office of the Press Secretary, The White House, Remarks by the President in Address to the Nation on Libya (Mar. 28, 2011) ("March 28, 2011 Address"), http://www.whitehouse.gov/the-press-office/2011/03/28/remarks-president-address-nation-libya (last visited ca. Apr. 2014).

Later the same day, the UNSC addressed the situation in Libya again by adopting, by a vote of 10-0 (with five members abstaining), Resolution 1973, which imposed a no-fly zone and authorized the use of military force to protect civilians. *See* S.C. Res. 1973, U.N. Doc. S/RES/1973 (Mar. 17, 2011); Press Release, Security Council, *Security Council Approves 'No-Fly Zone' Over Libya, Authorizing 'All Necessary Measures' to Protect Civilians, by Vote of 10 in Favour with 5 Abstentions*, U.N. Press Release SC/10200 (Mar. 17, 2011). In this resolution, the UNSC determined that the "situation" in Libya "continues to constitute a threat

to international peace and security" and "demand[ed] the immediate establishment of a cease-fire and a complete end to violence and all attacks against, and abuses of, civilians." S.C. Res. 1973. Resolution 1973 authorized member states, acting individually or through regional organizations, "to take all necessary measures . . . to protect civilians and civilian populated areas under threat of attack in the Libyan Arab Jamahiriya, including Benghazi, while excluding a foreign occupation force of any form on any part of Libyan territory." *Id.* ¶ 4. The resolution also specifically authorized member states to enforce "a ban on all [unauthorized] flights in the airspace of the Libyan Arab Jamahiriya in order to help protect civilians" and to take "all measures commensurate to the specific circumstances" to inspect vessels on the high seas suspected of violating the arms embargo imposed on Libya by Resolution 1970. *Id.* ¶¶ 6–8, 13.

In remarks on March 18, 2011, President Obama stated that, to avoid military intervention to enforce Resolution 1973, Qadhafi needed to: implement an immediate ceasefire, including by ending all attacks on civilians; halt his troops' advance on Benghazi; pull his troops back from three other cities; and establish water, electricity, and gas supplies to all areas. Press Release, Office of the Press Secretary, The White House, Remarks by the President on the Situation in Libya (Mar. 18, 2011) ("March 18, 2011 Remarks"), http://www.whitehouse.gov/the-press-office/2011/03/18/remarks-president-situation-libya (last visited ca. Apr. 2011). The President also identified several national interests supporting United States involvement in the planned operations:

> Now, here is why this matters to us. Left unchecked, we have every reason to believe that Qaddafi would commit atrocities against his people. Many thousands could die. A humanitarian crisis would ensue. The entire region could be destabilized, endangering many of our allies and partners. The calls of the Libyan people for help would go unanswered. The democratic values that we stand for would be overrun. Moreover, the words of the international community would be rendered hollow.

*Id.* President Obama further noted the broader context of the Libyan uprising, describing it as "just one more chapter in the change that is unfolding across the Middle East and North Africa." *Id.*

Despite a statement from Libya's Foreign Minister that Libya would honor the requested ceasefire, the Libyan government continued to conduct offensive operations, including attacks on civilians and civilian-populated areas. *See* Press Release, Office of the Press Secretary, The White House, *Letter from the President Regarding Commencement of Operations in Libya: Text of a Letter from the President to the Speaker of the House of Representatives and the President Pro Tempore of the Senate* (Mar. 21, 2011) ("March 21, 2011 Report to Congress"), http://www.whitehouse.gov/the-press-office/2011/03/21/letter-president-regarding-commencement-operations-libya (last visited ca. Apr. 2011). In response, on March 19, 2011, the United States, with the support of a number of its coalition partners, launched airstrikes against Libyan targets to enforce Resolution 1973. Consistent with the reporting provisions of the War Powers Resolution, 50 U.S.C. § 1543(a) (2006), President Obama provided a report to Congress less than forty-eight hours later, on March 21, 2011. The President explained:

> At approximately 3:00 p.m. Eastern Daylight Time, on March 19, 2011, at my direction, U.S. military forces commenced operations to assist an international effort authorized by the United Nations (U.N.) Security Council and undertaken with the support of European allies and Arab partners, to prevent a humanitarian catastrophe and address the threat posed to international peace and security by the crisis in Libya. As part of the multilateral response authorized under U.N. Security Council Resolution 1973, U.S. military forces, under the command of Commander, U.S. Africa Command, began a series of strikes against air defense systems and military airfields for the purposes of preparing a no-fly zone. These strikes will be limited in their nature, duration, and scope. Their purpose is to support an international coalition as it takes all necessary measures to enforce the terms of U.N. Security Council Resolution 1973. These limited U.S. actions will set the stage for further action by other coalition partners.

March 21, 2011 Report to Congress. The report then described the background to the strikes, including UNSC Resolution 1973, the demand for a ceasefire, and Qadhafi's continued attacks.

The March 21 report also identified the risks to regional and international peace and security that, in the President's judgment, had justified military intervention:

> Qadhafi's continued attacks and threats against civilians and civilian populated areas are of grave concern to neighboring Arab nations and, as expressly stated in U.N. Security Council Resolution 1973, constitute a threat to the region and to international peace and security. His illegitimate use of force not only is causing the deaths of substantial numbers of civilians among his own people, but also is forcing many others to flee to neighboring countries, thereby destabilizing the peace and security of the region. Left unaddressed, the growing instability in Libya could ignite wider instability in the Middle East, with dangerous consequences to the national security interests of the United States. Qadhafi's defiance of the Arab League, as well as the broader international community . . . represents a lawless challenge to the authority of the Security Council and its efforts to preserve stability in the region. Qadhafi has forfeited his responsibility to protect his own citizens and created a serious need for immediate humanitarian assistance and protection, with any delay only putting more civilians at risk.

*Id*. Emphasizing that "[t]he United States has not deployed ground forces into Libya," the President explained that "United States forces are conducting a limited and well-defined mission in support of international efforts to protect civilians and prevent a humanitarian disaster" and thus had targeted only "the Qadhafi regime's air defense systems, command and control structures, and other capabilities of Qadhafi's armed forces used to attack civilians and civilian populated areas." *Id.* The President also indicated that "[w]e will seek a rapid, but responsible, transition of operations to coalition, regional, or international organizations that are postured to continue activities as may be necessary to realize the objectives of U.N. Security Council Resolutions 1970 and 1973." *Id.* As authority for the military operations in Libya, President Obama invoked his "constitutional authority to conduct U.S. foreign relations" and his authority "as Commander in Chief and Chief Executive." *Id.*

Before the initiation of military operations in Libya, White House and other executive branch officials conducted multiple meetings and brief-

ings on Libya with members of Congress and testified on the Administration's policy at congressional hearings. *See* Press Release, Office of the Press Secretary, *Press Gaggle by Press Secretary Jay Carney, 3/14/2011* (Mar. 24, 2011), http://www.whitehouse.gov/the-press-office/2011/03/24/press-gaggle-press-secretary-jay-carney-3242011 (last visited ca. Apr. 2011). President Obama invited Republican and Democratic leaders of Congress to the White House for consultation on March 18, 2011 before launching United States military operations, *see id.*, and personally briefed members of Congress on the ongoing operations on March 25, 2011. Press Release, Office of the Press Secretary, Readout of the President's Meeting with Members of Congress on Libya (Mar. 25, 2011), http://www.whitehouse.gov/the-press-office/2011/03/25/readout-presidents-meeting-members-congress-libya (last visited ca. Apr. 2011). Senior executive branch officials are continuing to brief Senators and members of Congress on U.S. operations and events in Libya as they develop.

On March 28, 2011, President Obama addressed the nation regarding the situation in Libya. The President stated that the coalition had succeeded in averting a massacre in Libya and that the United States was now transferring "the lead in enforcing the no-fly zone and protecting civilians on the ground . . . to our allies and partners." March 28, 2011 Address. In future coalition operations in Libya, the President continued, "the United States will play a supporting role—including intelligence, logistical support, search and rescue assistance, and capabilities to jam regime communications." *Id.* The President also reiterated the national interests supporting military action by the United States. "[G]iven the costs and risks of intervention," he explained, "we must always measure our interests against the need for action." *Id.* But, "[i]n this particular country—Libya—at this particular moment, we were faced with the prospect of violence on a horrific scale," and "[w]e had a unique ability to stop that violence." *Id.* Failure to prevent a slaughter would have disregarded America's "important strategic interest in preventing Qaddafi from overrunning those who oppose him":

A massacre would have driven thousands of additional refugees across Libya's borders, putting enormous strains on the peaceful—yet fragile—transitions in Egypt and Tunisia. The democratic impulses that are dawning across the region would be eclipsed by the

darkest form of dictatorship, as repressive leaders concluded that violence is the best strategy to cling to power. The writ of the United Nations Security Council would have been shown to be little more than empty words, crippling that institution's future credibility to uphold global peace and security. So while I will never minimize the costs involved in military action, I am convinced that a failure to act in Libya would have carried a far greater price for America.

*Id.* As of March 31, 2011, the United States had transferred responsibility for all ongoing coalition military operations in Libya to the North Atlantic Treaty Alliance ("NATO").

## II.

The President explained in his March 21, 2011 report to Congress that the use of military force in Libya serves important U.S. interests in preventing instability in the Middle East and preserving the credibility and effectiveness of the United Nations Security Council. The President also stated that he intended the anticipated United States military operations in Libya to be limited in nature, scope, and duration. The goal of action by the United States was to "set the stage" for further action by coalition partners in implementing UNSC Resolution 1973, particularly through destruction of Libyan military assets that could either threaten coalition aircraft policing the UNSC-declared no-fly zone or engage in attacks on civilians and civilian-populated areas. In addition, no U.S. ground forces would be deployed, except possibly for any search and rescue missions, and the risk of substantial casualties for U.S. forces would be low. As we advised you prior to the commencement of military operations, we believe that, under these circumstances, the President had constitutional authority, as Commander in Chief and Chief Executive and pursuant to his foreign affairs powers, to direct such limited military operations abroad, even without prior specific congressional approval.

## A.

Earlier opinions of this Office and other historical precedents establish the framework for our analysis. As we explained in 1992, Attorneys General and this Office "have concluded that the President has the power to commit United States troops abroad," as well as to "take military

action," "for the purpose of protecting important national interests," even without specific prior authorization from Congress. *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6, 9 (1992) ("*Military Forces in Somalia*"). This independent authority of the President, which exists at least insofar as Congress has not specifically restricted it, *see Deployment of United States Armed Forces Into Haiti*, 18 Op. O.L.C. 173, 176 n.4, 178 (1994) ("*Haiti Deployment I*"), derives from the President's "unique responsibility," as Commander in Chief and Chief Executive, for "foreign and military affairs," as well as national security. *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 188 (1993); U.S. Const. art. II, § 1, cl. 1; *id.* § 2, cl. 2.

The Constitution, to be sure, divides authority over the military between the President and Congress, assigning to Congress the authority to "declare War," "raise and support Armies," and "provide and maintain a Navy," as well as general authority over the appropriations on which any military operation necessarily depends. U.S. Const. art. I, § 8, cls. 1, 11–14. Yet, under "the historical gloss on the 'executive Power' vested in Article II of the Constitution," the President bears the "'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)), and accordingly holds "independent authority 'in the areas of foreign policy and national security.'" *Id.* at 429 (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)); *see also, e.g.*, *Youngstown Sheet & Tube Co.*, 343 U.S. at 635–36 n.2 (Jackson, J., concurring) (noting President's constitutional power to "act in external affairs without congressional authority"). Moreover, the President as Commander in Chief "superintend[s] the military," *Loving v. United States*, 517 U.S. 748, 772 (1996), and "is authorized to direct the movements of the naval and military forces placed by law at his command." *Fleming v. Page*, 50 U.S. (9 How.) 603, 615 (1850); *see also Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 184 (1996). The President also holds "the implicit advantage . . . over the legislature under our constitutional scheme in situations calling for immediate action," given that imminent national security threats and rapidly evolving military and diplomatic circumstances may require a swift response by the United States without the opportunity for congressional deliberation and action.

*Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 187 (1980) ("*Presidential Power*"); *see also Haig*, 453 U.S. at 292 (noting "'the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature'") (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). Accordingly, as Attorney General (later Justice) Robert Jackson observed over half a century ago, "the President's authority has long been recognized as extending to the dispatch of armed forces outside of the United States, either on missions of goodwill or rescue, or for the purpose of protecting American lives or property or American interests." *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941).

This understanding of the President's constitutional authority reflects not only the express assignment of powers and responsibilities to the President and Congress in the Constitution, but also, as noted, the "historical gloss" placed on the Constitution by two centuries of practice. *Garamendi*, 539 U.S. at 414. "Our history," this Office observed in 1980, "is replete with instances of presidential uses of military force abroad in the absence of prior congressional approval." *Presidential Power*, 4A Op. O.L.C. at 187; *see generally* Richard F. Grimmett, Cong. Research Serv., R41677, *Instances of Use of United States Armed Forces Abroad, 1798–2010* (2011) ("Grimmet"). Since then, instances of such presidential initiative have only multiplied, with Presidents ordering, to give just a few examples, bombing in Libya (1986), an intervention in Panama (1989), troop deployments to Somalia (1992), Bosnia (1995), and Haiti (twice, 1994 and 2004), air patrols and airstrikes in Bosnia (1993–1995), and a bombing campaign in Yugoslavia (1999), without specific prior authorizing legislation. *See* Grimmett at 13–31. This historical practice is an important indication of constitutional meaning, because it reflects the two political branches' practical understanding, developed since the founding of the Republic, of their respective roles and responsibilities with respect to national defense, and because "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig*, 453 U.S. at 292. In this context, the "pattern of executive conduct, made under claim of right, extended over many decades and engaged in by Presidents of both parties, 'evidences the existence of

broad constitutional power.'" *Haiti Deployment I*, 18 Op. O.L.C. at 178 (quoting *Presidential Power*, 4A Op. O.L.C. at 187); *see also Proposed Deployment of United States Armed Forces into Bosnia*, 19 Op. O.L.C. 327, 330–31 (1995) ("*Proposed Bosnia Deployment*") (noting that "[t]he scope and limits" of Congress's power to declare war "are not well defined by constitutional text, case law, or statute," but the relationship between that power and the President's authority as Commander in Chief and Chief Executive has been instead "clarified by 200 years of practice").

Indeed, Congress itself has implicitly recognized this presidential authority. The War Powers Resolution ("WPR"), 50 U.S.C. §§ 1541–1548 (2006), a statute Congress described as intended "to fulfill the intent of the framers of the Constitution of the United States," *id.* § 1541(a), provides that, in the absence of a declaration of war, the President must report to Congress within 48 hours of taking certain actions, including introduction of U.S. forces "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." *Id.* § 1543(a). The Resolution further provides that the President generally must terminate such use of force within 60 days (or 90 days for military necessity) unless Congress extends this deadline, declares war, or "enact[s] a specific authorization." *Id.* § 1544(b). As this Office has explained, although the WPR does not itself provide affirmative statutory authority for military operations, *see id.* § 1547(d)(2), the Resolution's "structure . . . recognizes and presupposes the existence of unilateral presidential authority to deploy armed forces" into hostilities or circumstances presenting an imminent risk of hostilities. *Haiti Deployment I*, 18 Op. O.L.C. at 175; *see also Proposed Bosnia Deployment*, 19 Op. O.L.C. at 334. That structure—requiring a report within 48 hours after the start of hostilities and their termination within 60 days after that—"makes sense only if the President may introduce troops into hostilities or potential hostilities without prior authorization by the Congress." *Haiti Deployment I*, 18 Op. O.L.C. at 175–76; *see also Proposed Bosnia Deployment*, 19 Op. O.L.C. at 334–35.[1]

---

[1] A policy statement in the WPR states that "[t]he constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statuto-

We have acknowledged one possible constitutionally based limit on this presidential authority to employ military force in defense of important national interests—a planned military engagement that constitutes a "war" within the meaning of the Declaration of War Clause may require prior congressional authorization. *See Proposed Bosnia Deployment*, 19 Op. O.L.C. at 331; *Haiti Deployment I*, 18 Op. O.L.C. at 177. But the historical practice of presidential military action without congressional approval precludes any suggestion that Congress's authority to declare war covers every military engagement, however limited, that the President initiates. In our view, determining whether a particular planned engagement constitutes a "war" for constitutional purposes instead requires a fact-specific assessment of the "anticipated nature, scope, and duration" of the planned military operations. *Haiti Deployment I*, 18 Op. O.L.C. at 179. This standard generally will be satisfied only by prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period. Again, Congress's own key enactment on the subject reflects this understanding. By allowing United States involvement in hostilities to continue for 60 or 90 days, Congress signaled in the WPR that it considers congressional authorization most critical for "major, prolonged conflicts such as the wars in Vietnam and Korea," not more limited engagements. *Id.* at 176.

Applying this fact-specific analysis, we concluded in 1994 that a planned deployment of up to 20,000 United States troops to Haiti to oust military leaders and reinstall Haiti's legitimate government was not a "war" requiring advance congressional approval. *Id.* at 174 n.1, 178–79 &

---

ry authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces." 50 U.S.C. § 1541(c). But this policy statement "is not to be viewed as limiting presidential action in any substantive manner." *Presidential Power*, 4A Op. O.L.C. at 190. The conference committee report accompanying the WPR made clear that "[s]ubsequent sections of the [Resolution] are not dependent upon the language of" the policy statement. H.R. Rep. No. 93-547, at 8 (1973). Moreover, in a later, operative provision, the Resolution makes clear that nothing in it "is intended to alter the constitutional authority . . . of the President." 50 U.S.C. § 1547(d). As demonstrated by U.S. military interventions in Somalia, Haiti, Bosnia, and Kosovo, among many other examples, "the President's power to deploy armed forces into situations of actual or indicated hostilities is not restricted to the three categories specifically marked out by the Resolution." *Proposed Bosnia Deployment*, 19 Op. OLC. at 335; *see also Haiti Deployment I*, 18 Op. O.L.C. at 176 & n.3.

n.10; *see also Address to the Nation on Haiti*, 30 Weekly Comp. Pres. Doc. 1799 (Sept. 18, 1994); Maureen Taft-Morales & Clare Ribando Seelke, Cong. Research Serv., RL32294, *Haiti: Developments and U.S. Policy Since 1991 and Current Congressional Concerns* 4 (2008). "In deciding whether prior Congressional authorization for the Haitian deployment was constitutionally necessary," we observed, "the President was entitled to take into account the anticipated nature, scope, and duration of the planned deployment, and in particular the limited antecedent risk that United States forces would encounter significant armed resistance or suffer or inflict substantial casualties as a result of the deployment." *Haiti Deployment I*, 18 Op. O.L.C. at 179. Similarly, a year later we concluded that a proposed deployment of approximately 20,000 ground troops to enforce a peace agreement in Bosnia and Herzegovina also was not a "war," even though this deployment involved some "risk that the United States [would] incur (and inflict) casualties." *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333. For more than two years preceding this deployment, the United States had undertaken air operations over Bosnia to enforce a UNSC-declared "no-fly zone," protect United Nations peacekeeping forces, and secure "safe areas" for civilians, including one two-week operation in which NATO attacked hundreds of targets and the United States alone flew over 2300 sorties—all based on the President's "constitutional authority to conduct the foreign relations of the United States and as Commander in Chief and Chief Executive," without a declaration of war or other specific prior approval from Congress. *Letter to Congressional Leaders Reporting on the Deployment of United States Aircraft to Bosnia-Herzegovina* (Sept. 1, 1995), 2 Pub. Papers of Pres. William J. Clinton 1279, 1280 (1995); *see also, e.g.*, *Letter to Congressional Leaders on Bosnia*, 30 Weekly Comp. Pres. Doc. 2431, 2431 (Nov. 22, 1994); *Letter to Congressional Leaders on Bosnia-Herzegovina*, 30 Weekly Comp. Pres. Doc. 1699, 1700 (Aug. 22, 1994); *Letter to Congressional Leaders on Protection of United Nations Personnel in Bosnia-Herzegovina*, 30 Weekly Comp. Pres. Doc. 793, 793 (Apr. 12, 1994); *Letter to Congressional Leaders Reporting on NATO Action in Bosnia*, 30 Weekly Comp. Pres. Doc. 406, 406 (Mar. 1, 1994); *Letter to Congressional Leaders on the Conflict in the Former Yugoslavia*, 30 Weekly Comp. Pres. Doc. 324, 325 (Feb. 17, 1994); *Letter to Congressional Leaders Reporting on the No-Fly Zone Over Bosnia*, 29 Weekly Comp.

Pres. Doc. 586, 586 (Apr. 13, 1993); *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 328–29; *Deliberate Force: A Case Study in Effective Air Campaigning* 334, 341–44 (Col. Robert C. Owen ed., 2000), http://purl.access.gpo.gov/GPO/LPS20446 (last visited ca. Apr. 2011). This Office acknowledged that "deployment of 20,000 troops *on the ground* is an essentially different, and more problematic, type of intervention," than air or naval operations because of the increased risk of United States casualties and the far greater difficulty of withdrawing United States ground forces. But we nonetheless concluded that the anticipated risks were not sufficient to make the deployment a "'war' in any sense of the word." *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333–34 (emphasis in original).

## B.

Under the framework of these precedents, the President's legal authority to direct military force in Libya turns on two questions: first, whether United States operations in Libya would serve sufficiently important national interests to permit the President's action as Commander in Chief and Chief Executive and pursuant to his authority to conduct U.S. foreign relations; and second, whether the military operations that the President anticipated ordering would be sufficiently extensive in "nature, scope, and duration" to constitute a "war" requiring prior specific congressional approval under the Declaration of War Clause.

In prior opinions, this Office has identified a variety of national interests that, alone or in combination, may justify use of military force by the President. In 2004, for example, we found adequate legal authority for the deployment of U.S. forces to Haiti based on national interests in protecting the lives and property of Americans in the country, preserving "regional stability," and maintaining the credibility of United Nations Security Council mandates. *Deployment of United States Armed Forces to Haiti*, 28 Op. O.L.C. 30, 32–33 (2004) ("*Haiti Deployment II*"). In 1995, we similarly concluded that the President's authority to deploy approximately 20,000 ground troops to Bosnia, for purposes of enforcing a peace agreement ending the civil war there, rested on national interests in completing a "pattern of inter-allied cooperation and assistance" established by prior U.S. participation in NATO air and naval support for peacekeeping efforts, "preserving peace in the region and forestalling the threat of a wider

conflict," and maintaining the credibility of the UNSC. *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 332–33. And in 1992, we explained the President's authority to deploy troops in Somalia in terms of national interests in providing security for American civilians and military personnel involved in UNSC-supported humanitarian relief efforts and (once again) enforcing UNSC mandates. *Military Forces in Somalia*, 16 Op. O.L.C. at 10–12.[2]

In our view, the combination of at least two national interests that the President reasonably determined were at stake here—preserving regional stability and supporting the UNSC's credibility and effectiveness—provided a sufficient basis for the President's exercise of his constitutional authority to order the use of military force.[3] First, the United States has a strong national security and foreign policy interest in security and stability in the Middle East that was threatened by Qadhafi's actions in Libya. As noted, we recognized similar regional stability interests as justifications for presidential military actions in Haiti and Bosnia. With respect to Haiti, we found "an obvious interest in maintaining peace and stability," "[g]iven the proximity of Haiti to the United States," and particularly considering that "past instances of unrest in Haiti have led to the mass emigration of refugees attempting to reach the United States." *Haiti Deployment II*, 28 Op. O.L.C. at 32–33. In the case of Bosnia, we noted (quoting prior statements by President Clinton justifying military action) the longstanding commitment of the United States to the "'principle that the security and stability of Europe is of fundamental interest to the United States,'" and we identified, as justification for the military action, the

---

[2] As these examples make clear, defense of the United States to repel a direct and immediate military attack is by no means the only basis on which the President may use military force without congressional authorization. Accordingly, the absence of an immediate self-defense interest does not mean that the President lacked authority for the military operations in Libya.

[3] Although President Obama has expressed opposition to Qadhafi's continued leadership of Libya, we understand that regime change is not an objective of the coalition's military operations. *See* March 28, 2011 Address ("Of course, there is no question that Libya—and the world—would be better off with Qaddafi out of power. I . . . will actively pursue [that goal] through non-military means. But broadening our military mission to include regime change would be a mistake."). We therefore do not consider any national interests relating to regime change in assessing the President's legal authority to order military operations in Libya.

President's determination that "[i]f the war in the former Yugoslavia resumes, 'there is a very real risk that it could spread beyond Bosnia, and involve Europe's new democracies as well as our NATO allies.'" *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333. In addition, in another important precedent, President Clinton justified extensive airstrikes in the Federal Republic of Yugoslavia ("FRY") in 1999—military action later ratified by Congress but initially conducted without specific authorization, *see Authorization for Continuing Hostilities in Kosovo*, 24 Op. O.L.C. 327 (2000)—based on concerns about the threat to regional security created by that government's repressive treatment of the ethnic Albanian population in Kosovo. "The FRY government's violence," President Clinton explained, "creates a conflict with no natural boundaries, pushing refugees across borders and potentially drawing in neighboring countries. The Kosovo region is a tinderbox that could ignite a wider European war with dangerous consequences to the United States." *Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro)*, 35 Weekly Comp. Pres. Doc. 527, 527 (Mar. 26, 1999).

As his statements make clear, President Obama determined in this case that the Libyan government's actions posed similar risks to regional peace and security. Much as violence in Bosnia and Kosovo in the 1990s risked creating large refugee movements, destabilizing neighboring countries, and inviting wider conflict, here the Libyan government's "illegitimate use of force . . . [was] forcing many [civilians] to flee to neighboring countries, thereby destabilizing the peace and security of the region." March 21, 2011 Report to Congress. "Left unaddressed," the President noted in his report to Congress, "the growing instability in Libya could ignite wider instability in the Middle East, with dangerous consequences to the national security interests of the United States." *Id.* Without outside intervention, Libya's civilian population faced a "humanitarian catastrophe," *id.*; as the President put it on another occasion, "innocent people" in Libya were "being brutalized" and Qadhafi "threaten[ed] a bloodbath that could destabilize an entire region." Press Release, Office of the Press Secretary, The White House, *Weekly Address: President Obama Says the Mission in Libya is Succeeding* (Mar. 26, 2011), http://www.whitehouse.gov/the-press-office/2011/03/26/weekly-address-president-obama-says-mission-libya-succeeding (last visited ca. Apr. 2011). The risk of regional destabilization in this case was also recognized by the

UNSC, which determined in Resolution 1973 that the "situation" in Libya "constitute[d] a threat to international peace and security." S.C. Res. 1973. As this Office has previously observed, "[t]he President is entitled to rely on" such UNSC findings "in making his determination that the interests of the United States justify providing the military assistance that [the UNSC resolution] calls for." *Military Forces in Somalia*, 16 Op. O.L.C. at 12.[4]

Qadhafi's actions not only endangered regional stability by increasing refugee flows and creating a humanitarian crisis, but, if unchecked, also could have encouraged the repression of other democratic uprisings that were part of a larger movement in the Middle East, thereby further undermining United States foreign policy goals in the region. Against the background of widespread popular unrest in the region, events in Libya formed "just one more chapter in the change that is unfolding across the Middle East and North Africa." March 18, 2011 Remarks. Qadhafi's campaign of violence against his own country's citizens thus might have set an example for others in the region, causing "[t]he democratic impulses that are dawning across the region [to] be eclipsed by the darkest form of dictatorship, as repressive leaders concluded that violence is the best strategy to cling to power." March 28, 2011 Address. At a minimum, a massacre in Libya could have imperiled transitions to democratic government underway in neighboring Egypt and Tunisia by driving "thousands of additional refugees across Libya's borders." *Id.* Based on these factors, we believe the President could reasonably find a significant national security interest in preventing Libyan instability from spreading elsewhere in this critical region.

The second important national interest implicated here, which reinforces the first, is the longstanding U.S. commitment to maintaining the credibility of the United Nations Security Council and the effectiveness of its actions to promote international peace and security. Since at least the Korean War, the United States government has recognized that "'[t]he continued existence of the United Nations as an effective interna-

---

[4] We note, however, that, at least for purposes of domestic law, a Security Council resolution is "not required as a precondition for Presidential action." *Military Forces in Somalia*, 16 Op. O.L.C. at 7. Rather, as we explained in 2004, "in exercising his authority as Commander in Chief and Chief Executive, the President [may] choose to take" the UNSC resolution into account "in evaluating the foreign policy and national security interests of the United States that are at stake." *Haiti Deployment II*, 28 Op. O.L.C. at 33.

tional organization is a paramount United States interest.'" *Military Forces in Somalia*, 16 Op. O.L.C. at 11 (quoting *Authority of the President to Repel the Attack in Korea*, 23 Dep't of State Bull. 173, 177 (1950)). Accordingly, although of course the President is not required to direct the use of military force simply because the UNSC has authorized it, this Office has recognized that "'maintaining the credibility of United Nations Security Council decisions, protecting the security of United Nations and related relief efforts, and ensuring the effectiveness of United Nations peacekeeping operations can be considered a vital national interest'" on which the President may rely in determining that U.S. interests justify the use of military force. *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333 (quoting *Military Forces in Somalia*, 16 Op. O.L.C. at 11). Here, the UNSC's credibility and effectiveness as an instrument of global peace and stability were at stake in Libya once the UNSC took action to impose a no-fly zone and ensure the safety of civilians—particularly after Qadhafi's forces ignored the UNSC's call for a cease fire and for the cessation of attacks on civilians. As President Obama noted, without military action to stop Qadhafi's repression, "[t]he writ of the United Nations Security Council would have been shown to be little more than empty words, crippling that institution's future credibility to uphold global peace and security." March 28, 2011 Address; s*ee also* March 21, 2011 Report to Congress ("Qadhafi's defiance of the Arab League, as well as the broader international community . . . represents a lawless challenge to the authority of the Security Council and its efforts to preserve stability in the region."). We think the President could legitimately find that military action by the United States to assist the international coalition in giving effect to UNSC Resolution 1973 was needed to secure "a substantial national foreign policy objective." *Military Forces in Somalia*, 16 Op. O.L.C. at 12.

We conclude, therefore, that the use of military force in Libya was supported by sufficiently important national interests to fall within the President's constitutional power. At the same time, turning to the second element of the analysis, we do not believe that anticipated United States operations in Libya amounted to a "war" in the constitutional sense necessitating congressional approval under the Declaration of War Clause. This inquiry, as noted, is highly fact-specific and turns on no single factor. *See Proposed Bosnia Deployment*, 19 Op. O.L.C. at 334 (reaching conclusion

based on specific "circumstances"); *Haiti Deployment I*, 18 Op. O.L.C. at 178 (same). Here, considering all the relevant circumstances, we believe applicable historical precedents demonstrate that the limited military operations the President anticipated directing were not a "war" for constitutional purposes.

As in the case of the no-fly zone patrols and periodic airstrikes in Bosnia before the deployment of ground troops in 1995 and the NATO bombing campaign in connection with the Kosovo conflict in 1999—two military campaigns initiated without a prior declaration of war or other specific congressional authorization—President Obama determined that the use of force in Libya by the United States would be limited to airstrikes and associated support missions; the President made clear that "[t]he United States is not going to deploy ground troops in Libya." March 18, 2011 Remarks. The planned operations thus avoided the difficulties of withdrawal and risks of escalation that may attend commitment of ground forces—two factors that this Office has identified as "arguably" indicating "a greater need for approval [from Congress] at the outset," to avoid creating a situation in which "Congress may be confronted with circumstances in which the exercise of its power to declare war is effectively foreclosed." *Proposed Bosnia Deployment*, 19 Op. O.L.C. at 333. Furthermore, also as in prior operations conducted without a declaration of war or other specific authorizing legislation, the anticipated operations here served a "limited mission" and did not "aim at the conquest or occupation of territory." *Id.* at 332. President Obama directed United States forces to "conduct[] a limited and well-defined mission in support of international efforts to protect civilians and prevent a humanitarian disaster"; American airstrikes accordingly were to be "limited in their nature, duration, and scope." March 21, 2011 Report to Congress. As the President explained, "we are not going to use force to go beyond [this] well-defined goal." March 18, 2011 Remarks. And although it might not be true here that "the risk of sustained military conflict was negligible," the anticipated operations also did not involve a "preparatory bombardment" in anticipation of a ground invasion—a form of military operation we distinguished from the deployment (without preparatory bombing) of 20,000 U.S. troops to Haiti in concluding that the latter operation did not require advance congressional approval. *Haiti Deployment I*, 18 Op. O.L.C. at 176, 179. Considering the historical practice of even intensive

military action—such as the 17-day-long 1995 campaign of NATO airstrikes in Bosnia and some two months of bombing in Yugoslavia in 1999—without specific prior congressional approval, as well as the limited means, objectives, and intended duration of the anticipated operations in Libya, we do not think the "anticipated nature, scope, and duration" of the use of force by the United States in Libya rose to the level of a "war" in the constitutional sense, requiring the President to seek a declaration of war or other prior authorization from Congress.

Accordingly, we conclude that President Obama could rely on his constitutional power to safeguard the national interest by directing the anticipated military operations in Libya—which were limited in their nature, scope, and duration—without prior congressional authorization.

CAROLINE D. KRASS
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*