NOONAN, Circuit Judge,
concurring:
I concur in the opinion of the court. I write separately to emphasize the intent of the statute and its incompatibility with federal foreign policy.
Consideration of the constitutionality of the statute begins with Section 1 of the law, which in entirety, reads as follows:
Sec. 1. Intent
The legislature finds that there is a compelling interest in the cooperative enforcement of federal immigration laws throughout all of Arizona. The legislature declares that the intent of this act is to make attrition through enforcement the public policy of all state and local government agencies in Arizona. The provisions of this act are intended to work together to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.
This section of the act constitutes an authoritative statement of the legislative purpose. The purpose is “attrition,” a noun which is unmodified but which can only refer to the attrition of the population of immigrants unlawfully in the state. The purpose is to be accomplished by “enforcement,” also unmodified but in context re *367 ferring to enforcement of law by the agencies of Arizona. The provisions of the act are “intended to work together.” Working together, the sections of the statute are meant “to discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.”
It would be difficult to set out more explicitly the policy of a state in regard to aliens unlawfully present not only in the state but in the United States. The presence of these persons is to be discouraged and deterred. Their number is to be diminished. Without qualification, Arizona establishes its policy on immigration.
As Section 1 requires, each section of the statute must be read with its stated purpose in mind. Section 2 might, in isolation from Section 1, be read as requiring information only. Such a reading would ignore the intent established in Section 1, to secure attrition through enforcement. As the United States observes, Arizona already had the capability of obtaining information on immigrants by consulting the federal database maintained by the federal government. Section 2 of the statute provides for more — for the detention of immigrants to achieve the purpose of the statute. Section 2 is not intended as a means of acquiring information. It is intended to work with the other provisions of the act to achieve enforcement.
As the opinion of the court makes clear, Sections 3, 5 and 6 are unconstitutional. Section 2 is equally unconstitutional in its function as their support.
Section l’s profession of “cooperative” enforcement of federal immigration laws does not alter Arizona’s enactment of its own immigration policy distinct from the immigration policy and the broader foreign policy of the United States.
Federal foreign policy is a pleonasm. What foreign policy can a federal nation have except a national policy? That fifty individual states or one individual state should have a foreign policy is absurdity too gross to be entertained. In matters affecting the intercourse of the federal nation with other nations, the federal nation must speak with one voice.
That immigration policy is a subset of foreign policy follows from its subject: the admission, regulation and control of foreigners within the United States. By its subject, immigration policy determines the domestication of aliens as American citizens. It affects the nation’s interactions with foreign populations and foreign nations. It affects the travel of foreigners here and the trade conducted by foreigners here. It equally and reciprocally bears on the travel and trade of Americans abroad. As the declarations of several countries or governmental bodies demonstrate in this case, what is done to foreigners here has a bearing on how Americans will be regarded and treated abroad.
That the movement of the people of one nation into the boundaries of another nation is a matter of national security is scarcely a doubtful or debatable matter. Almost everyone is familiar with how the movement of the Angles and the Saxons into Roman Britain transformed that country. The situation of the United States is less precarious. Nonetheless, an estimated 10.8 million foreigners have illegally taken up residence in our country. U.S. Dept, of Homeland Sec., Office of Immigration Statistics, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2010 at 2. True, at the maximum, their number is less than 4% of our population. They are not about to outnumber our citizens. Still, in individual towns and areas those illegally present can be a substantial presence. *368 In the state of Arizona, their estimated number is 470,000, or seven percent of the population of the state. Id. at 4.
The local impact appears to call for local response. Yet ineluctably the issue is national. The people of other nations are entering our nation and settling within its borders contrary to our nation’s stated requirements. We must deal with people of other nations and so must deal with other nations. The problems are local but our whole nation is affected. Reasonably, the nation has made enforcement of criminal sanctions against aliens criminally present in the United States the top priority of the federal government. United States Sentencing Commission, Overview of Federal Criminal Cases Fiscal Year 2009 at 1.
Against this background, the following propositions are clear:
The foreign policy of the United States preempts the field entered by Arizona. Foreign policy is not and cannot be determined by the several states. Foreign policy is determined by the nation as the nation interacts with other nations. Whatever in any substantial degree attempts to express a policy by a single state or by several states toward other nations enters an exclusively federal field.
Federal foreign policy is determined by Congress when Congress exercises the power to declare war conferred upon it by Article I, Section 8 of the Constitution. Foreign policy is also determined by the Senate when it exercises the power to ratify a treaty, the power conferred upon it by Article II, Section 2. Congress also determines foreign policy when it lays excise taxes upon foreign imports under Article I, Section 8. Congress further determines foreign policy when it authorizes sanctions against a nation, e.g., Crosby v. National Foreign Trade Council, 530 U.S.
363, 120 S.Ct. 2288, 147 L.Ed.2d 352
(2000).
The foreign policy of the nation consists in more than a declaration of war, the making of a treaty, the imposition of a tax, and the imposition of sanctions. The foreign policy of the nation is also established by acts of executive power — among others, executive agreements with foreign nations; the appointment of ambassadors to foreign nations; the exchange of information with foreign governments; the encouragement of trade with foreign countries; and the facilitation of the travel abroad of Americans and of travel within the United States by foreigners. In these several ways a federal foreign policy is forged that is as palpable and durable as that expressed by a particular act of legislation or by the ratification of a particular treaty.
Less than eight years ago the Supreme Court reviewed and reaffirmed the position of the Executive Branch in forming foreign policy preemptive of legislation by a state. Am. Ins. Ass’n v. Garamendi, 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). Strong humanitarian considerations supported California’s legislation to provide a remedy against insurance companies that had profited from the Nazi treatment of Jewish victims of the Holocaust. Recognizing that “the iron fist” of California might be more effective than the gentler approach taken by the Executive Branch, the Supreme Court assembled cases showing the President’s “unique responsibility” for the conduct of foreign policy. Id. at 415, 123 S.Ct. 2374. Noting that no express text in the Constitution conferred this authority, the Court quoted both Hamilton and Madison in The Federalist on the structure of the nation being designed. Structure was stronger than text. The Supreme Court demonstrated that strength in an unbroken line of decisions acknowledging presidential leader *369 ship in foreign affairs. Id. at 413^15, 123 S.Ct. 2374. Presidential power to preempt states from acting in matters of foreign policy is beyond question.
To take one example from our relations to our nearest neighbor to the South, it is an expression of federal foreign policy that the State Department issues passports by whose use approximately twenty million American citizens enter Mexico annually, while the State Department annually issues approximately one million visas which enable citizens of Mexico to enter this country. U.S. Dep’t of Commerce, Int’l Trade Admin., 2009 United States Resident Travel Abroad 3 (2010); U.S. Dep’t of State, Report of the Visa Office 2010 at Table XVII (2011).
The foreign policy of the United States is further established by trade agreements made between this country and Mexico manifesting the desire to permit the importation of a variety of goods from Mexico and the desire to export goods from the United States into Mexico.
An objective assessment of the foreign policy of the United States toward Mexico would pronounce that policy to be one of cordiality, friendship and cooperation. The tangible expression of this policy is the export of $14.8 billion in goods in January 2011 and the importation of $19.7 billion in goods from Mexico in the same month. News Release, U.S. Census Bureau, U.S. Bureau of Economic Analysis, U.S. Int’l Trade in Goods and Services 16 (March 10, 2011).
Understandably, the United States finds such a policy preemptive of a single state’s uninvited effort to enter the field of immigration law.
The Arizona statute before us has become a symbol. For those sympathetic to immigrants to the United States, it is a challenge and a chilling foretaste of what other states might attempt. For those burdened by unlawful immigration, it suggests how a state could tackle that problem. It is not our function, however, to evaluate the statute as a symbol. We are asked to assess the constitutionality of five sections on their face integrated by the intent stated in Section 1. If we read Section 1 of the statute, the statute states the purpose of providing a solution to illegal immigration into the United States. So read, the statute is a singular entry into the foreign policy of the United States by a single state. The district court properly enjoined implementation of the four sections of the statute.